71 F.2d 802 (1934)
In re KENTUCKY WAGON MFG. CO.
LAURENT
v.
STITES et al.
ANDERSON
v.
SAME.
Nos. 6483, 6484.
Circuit Court of Appeals, Sixth Circuit.
June 29, 1934.
David R. Castleman and H. B. Lee, both of Louisville, Ky. (Selligman, Selligman & Goldsmith, of Louisville, Ky., on the brief), for appellants.
Ernest Woodward and D. A. Sachs, Jr., both of Louisville, Ky. (Thos. S. Dawson and Woodward, Hamilton & Hobson, all of Louisville, Ky., on the brief), for appellees.
Before HICKS and SIMONS, Circuit Judges, and RAYMOND, District Judge.
HICKS, Circuit Judge.
Kentucky Wagon Manufacturing Company, a Delaware corporation (herein called New Company), was adjudged a bankrupt on January 12, 1931. Laurent, receiver of the Banco Kentucky Company (herein called Banco), filed claim against the bankrupt for $2,795,211.70, alleging that the indebtedness was secured by a $2,000,000 first mortgage real estate temporary bond of the New Company. Stites, the bankrupt's trustee, objected upon the ground that the bankrupt was a corporate agency entirely owned and controlled by the National Bank of Kentucky (herein called the Bank), from whom Banco, with knowledge thereof, had on July 3, 1930, acquired its claim. George D. Caldwell, trustee under the mortgage, filed a foreclosure petition in the bankruptcy cause. Stites, trustee, by answer resisted this petition upon substantially the same grounds upon which he disputed Banco's claim. Paul C. Keyes, receiver of the Bank, also filed a claim against the bankrupt for $71,713.14, representing money advanced to the New Company after Banco had acquired its claim, which for the same reason was objected to by the bankrupt's trustee.
The court sustained the objection to both claims, hence this appeal.
Prior to 1922 the Kentucky Wagon Manufacturing Company of Kentucky (herein called the Old Company), was engaged in building and selling wagons and other vehicles. In that year it sold its property to the National Motors Company, which was unable to pay for it and was subsequently adjudged a bankrupt. For this and other causes the Old Company was forced into bankruptcy. The Bank, in addition to being the principal creditor through the making of large loans, had, in an effort to protect itself, bought in substantially all the Old Company's indebtedness. In July, 1924, Nicholas H. Dosker, agent of the Bank, purchased the assets of the Old Company at a bankrupt sale for $385,000. He paid $38,500 in money of the Bank, and was credited with the balance by claims due from the Old Company to the Bank. Thereupon the Bank brought about *803 the incorporation of the New Company for the operation of the business and paid all the expense of the incorporation.
The three incorporators met in Louisville at the offices of the Bank on July 26, 1924, and went through the form of choosing five directors. These directors were in fact designated by James B. Brown, president of the Bank. One of them, Mr. Angermeier, was vice president of the Bank. Another director, Mr. R. V. Board, president of the Old Company, was employed by the Bank as president of the New Company at a fixed salary of $12,000 a year. He was later advised by a phone message that his salary had been reduced to $10,000 a year. All the other executive heads of the New Company were employed by the Bank.
On August 8, 1924, the board of directors of the New Company as above constituted ostensibly purchased, as evidenced by a bill of sale, all of the assets of the Old Company which had been sold to the Bank. (At that time the Bank owned only the equitable title to the real estate, but in 1927 it purchased the legal title and vested it nominally in the New Company.) The bill of sale was signed by the Bank, by Board and J. R. Duffin, creditors of the Old Company, and also by both the Old and the New Company. Just why it was thought necessary for parties other than the Bank to sign the bill of sale does not appear and is not material to determine.
The bill of sale recites that the New Company was to execute its notes to the following parties in the following amounts:

 To Inter-Southern Life Insurance
 Co. .............................. $ 52,383.33
 To the National Bank of Kentucky ... 899,014.22
 To Robert V. Board ................. 39,906.00
 To William E. Massey ............... 19,066.67
 To James R. Duffin ................. 75,781.67
 To J. F. Murphy .................... 539.79

And, further, it was to deliver to the Bank 45,000 shares of its common stock of the par value of $10 per share and of the market value of $45,000, and to Robert V. Board 45,000 similar shares. The notes were never executed and the stock was never issued.
The amount to be paid to the Bank represented the indebtedness of the Old Company to it together with the amounts paid by it in the purchase of the Old Company's assets and in the organization of the New Company.
Being thus organized, the New Company was ready to operate, although it could not legally do so in Kentucky under its laws because fifty per cent. of its capital stock had not been subscribed for. But it had no capital, and to meet its operating requirements the Bank permitted the New Company to make large overdrafts without security for the period from August, 1924, until bankruptcy. It was the custom to settle these overdrafts by allowing the New Company to execute its notes in blank to the Bank and the Bank would fill in the requisite amounts In this manner the alleged indebtedness to the Bank grew until it amounted to the sum set out in the Bank's claim. Of the four directors of the New Company who authorized the $2,000,000 mortgage on November 1, 1927, three of them were directors of the Bank and were admittedly acting for it.
The New Company borrowed no money from, and kept no deposits in, any other bank. The officers and directors of the New Company had no independent policy. They operated under the forms of corporate management and organization, but they always faithfully carried out the orders and directions of the bank. No stock in the New Company was ever issued. No stockholders' meetings were held, and, when it became necessary to select new directors, they were always designated by the Bank. It was generally understood that the Bank was the owner of the assets of the New Company and was in actual control of its affairs, and during that period the Bank at large expense, involving many thousands of dollars, made strenuous efforts to sell stock or to sell the property and recoup its losses.
Mr. Brown, the president, testified that "of course the Bank was in the Wagon Company business, no question about that, but banks frequently go into businesses that they don't like to be in." He further testified: "The Bank owned the Wagon Company absolutely and entirely since the incorporation of the Delaware Company. * * * We wanted to get rid of it and did everything we could to get rid of it. * * * The Board of Directors of the National Bank of Kentucky named the directors of the Wagon Company and the persons who should act as principal officers of that company. I was the spokesman for the Board of Directors of the Bank of Kentucky. There were never any directors elected to the board of the Kentucky Wagon Company. They were told to take charge. It was the same way with the principal officers. We selected Mr. Board, and I think Mr. Board and the other gentlemen selected the others with our approval. Mr. Gijax *804 and Mr. Robinson were elected by our Vice-Presidents and required to consult with them. They put them in."
Mr. Jones, first vice president of the Bank, also testified that, so far as he knew, the Wagon Company "was owned absolutely and entirely by the Bank."
The record discloses more than one instance in which the Bank held itself out as the owner of the New Company and as responsible for its debts and in this way secured credit for it. It so represented the situation to the Comptroller.
Banco purchased the claim of the Bank on July 3, 1930. Banco and the Bank had the same president and an interlocking directorate, and Banco was chargeable with knowledge of the nature of the claim it acquired.
The determinative question is, not whether the New Company was in fact a legal entity or corporation, but whether the relationship of agent and principal existed as between it and the Bank; i. e., whether the New Company was an instrumentality of, or an adjunct to, the Bank. See Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U. S. 490, 501, 38 S. Ct. 553, 62 L. Ed. 1229; United States v. Reading Co., 253 U. S. 26, 62, 40 S. Ct. 425, 64 L. Ed. 760; New York Trust Co. v. Island Oil & Transport Corp'n, 56 F.(2d) 580, 583 (C. C. A. 2); Clere Clothing Co. v. Union Trust & Savings Bank, 224 F. 363, 366 (C. C. A. 9); Central Republic Bank & Trust Co. v. Caldwell, 58 F.(2d) 721, 735 (C. C. A. 8); Wabash Ry. Co. v. American Refrig. Transit Co., 7 F.(2d) 335, 343 (C. C. A. 8); Fourth Natl. Bank of Montgomery v. Portsmouth Cotton Oil Ref. Corp'n., 284 F. 718 (C. C. A. 5); In re Muncie Pulp Co., 139 F. 546 (C. C. A. 2); Centmont Corporation v. Marsch, 68 F.(2d) 460, 463 (C. C. A. 1).
The undisputed facts answer this question. It is clear that the Bank purchased the indebtedness of the Old Company in an effort to protect itself from its anticipated bankruptcy; that, when bankruptcy intervened, it purchased the Old Company with all its assets and operated it in the name of the New Company, consisting of little more than a name; that the plant itself was owned by the Bank and operated by its officers and agents in the hope that it might eventually be sold as a going concern with a profit or at least with little loss. To allow the claim would be nothing short of permitting the Bank to prove its debts against itself and satisfy them out of its own assets to the exclusion of the rights of bona fide creditors. It is also apparent that the $2,000,000 mortgage was in substance nothing more than an attempt to secure to the Bank a lien upon its own property.
The claim of Keyes, receiver of the Bank, for money advanced to the New Company after Banco had acquired its claim, can stand upon no higher ground. Appellant insists that, if this conclusion is correct, then it follows that the Bank had no authority to organize the New Company, and that its act in so doing was ultra vires. Conceding this, appellant cannot validate an otherwise unlawful claim by its own misconduct. See Wallerstein v. Ervin, 112 F. 124 (C. C. A. 3).
The judgment of the District Court is affirmed.