## TAYLOR et al. v. STANDARD GAS & ELECTRIC CO. et al.

### No. 1545.

Circuit Court of Appeals, Tenth Circuit.

April 27, 1938.

Rehearing Denied June 6, 1938.

Jason L. Honigman, of Detroit, Mich. (Sempliner, Dewey, Stanton & Honigman, of Detroit, Mich., Milsten & Milsten, of Tulsa, Okl., and A. W. Sempliner, Milton J. Miller, and Leonard Horton, all of Detroit, Mich., on the brief), for appellants.

N. A. Gibson, of Tulsa, Okl. (R. M. Campbell, of Chicago, Ill., and Wilbur J. Holleman, of Tulsa, Okl., on the brief), for Standard Gas & Electric Co.

James F. Oates, Jr., of Chicago, Ill. (Sidley, McPherson, Austin & Burgess, of Chicago, Ill., Campbell & Biddison, of Tulsa, Okl., and Paul V. Harper, John Dern, and Charles F. Martin, Jr., all of Chicago, Ill., on the brief), for Reorganization Committee.

George S. Ramsey, of Tulsa, Okl. (Edgar A. de Meules, Villard Martin, and Garrett Logan, all of Tulsa, Okl., on the brief), for H. N. Greis, trustee.

W. F. Semple, of Tulsa, Okl., for Deep Rock Oil Corporation.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

PHILLIPS, Circuit Judge, delivered the opinion of the court.

This is an appeal from orders confirming a plan of reorganization under section 77B of the Bankruptcy Act, as amended, 11 U.S.C.A. § 207 and note, and the approval of a compromise of a claim against the debtor as an integral part of the plan.

The debtor was incorporated under the laws of Delaware on May 31, 1919, under the name of Shaffer Oil & Refining Company. In 1931 its name was changed to Deep Rock Oil Corporation. It will hereinafter be referred to as Deep Rock. The claimant, Standard Gas and Electric Company, hereinafter called Standard, was organized under the laws of Delaware in 1910.

H. M. Byllesby & Company, hereinafter called Byllesby, was organized under the laws of Delaware in 1904. It is an investment banking company engaged in underwriting, marketing and selling securities and in holding investment securities. Prior to 1919 it also engaged in engineering and management service.

Standard Power and Light Company owned a majority of the voting stock of Standard. Byllesby and United Electric Power Company owned the majority of the voting stock of Standard Power and Light Company; up to 1936, through this ownership, they jointly controlled Standard. Byllesby elected eight of the fifteen directors of Standard. However, in 1936 Byllesby was wholly divorced from Standard.

Byllesby Engineering and Management Corporation, hereinafter called Management Corporation, was organized under the laws of Delaware in 1919. It took over the engineering and management staffs of Byllesby. It furnishes the service of trained experts and technicians in the fields of management, engineering, insurance, advertising, rate making, financing, and valuation. It also maintains a purchasing department through which mass purchases at quantity discounts are made for the corporations it serves. All of its stock was issued to Standard.

Since its organization Standard has engaged in the investment business. Since 1919 it has also engaged, through its wholly owned subsidiary the Management Corporation, in furnishing engineering and other technical service. Up to 1919 Standard's investments were wholly in public utility securities. In that year, because of concern respecting the existing financial situation and diminishing returns from its public utility investments, it sought an investment opportunity in a field that would bring it greater returns, and its attention was directed to the oil business, a wholly unrelated industry. Messrs. C. B. Shaffer and E. E. Smathers owned a very large integrated oil business in the states of Oklahoma, Arkansas, and Kansas and the opportunity to acquire an interest in that business was brought to the attention of Standard. Negotiations were carried on which resulted in a contract on May 20, 1919, between Shaffer and Byllesby. It provided that Shaffer should organize a corporation under the laws of Delaware and in consideration of $15,580,000.00, convey to it certain oil properties consisting of lands, developed and undeveloped leases, and plants, stations and equipment for the production of crude oil and the refining, manufacture and sale of petroleum products; and that Byllesby should purchase from the corporation to be formed $11,000,000.00 par value of bonds, 50,000 shares of preferred stock of the par value of $100.00 each, and 120,000 shares of common stock and pay therefor $15,200,000.00 in cash.

Deep Rock was organized, Shaffer transferred the properties to it and received therefor $9,500,000.00 in cash, the note of Byllesby and Standard due in four months for $1,000,000.00, 80,000 shares of Deep Rock common and 50,000 shares of Deep Rock preferred. From March 31, 1920, to March 18, 1921, Shaffer was a director and president of Deep Rock. Standard was dissatisfied with the results obtained under Shaffer's management. In 1921 arrangements were made for him to retire from Deep Rock under which he surrendered bonds of Deep Rock of the par value of $200,000.00, preferred stock of Deep Rock of the par value of $5,000,000.00, and 80,000 shares of common stock of Deep Rock, for which Deep Rock paid him $10,000.00 in cash and gave him two notes, in the aggregate amount of $740,000.00, and certain oil properties in the state of Louisiana. Shaffer resigned as an officer and director and four other directors who had been elected at the request of Shaffer also resigned. In May, 1921, an appropriate reserve for the reduction in assets was set up on Deep Rock's books.

The capital structure of Deep Rock at the time of its organization was 500,000

shares of common stock, par value $1.00 per share, 50,000 shares of preferred stock, par value $100.00 per share, and $15,000,000.00 of first mortgage bonds. After 1928 the capital structure consisted of $10,000,000.00 of publicly owned 6 per cent notes, 50,000 shares of publicly owned preferred stock, par value $100.00 per share, and 580,000 shares of common stock. From the formation of Deep Rock, Standard owned a majority of the shares of common stock. From the time of the retirement of Shaffer, Standard owned substantially all of the common stock. At the time of the inception of the receivership, hereinafter referred to, it owned 98 per cent of the common stock. From 1921 to 1932, inclusive, Standard elected the board of directors of Deep Rock. A majority of such directors were also directors of Standard. During that period certain of the officers of Deep Rock were also officers of Standard.

In 1924, John L. Gray, an experienced engineer and refinery operator, was employed to make a survey and report on Deep Rock and its subsidiaries; on October 1, 1924, he became its executive vice president and general manager and continued in that capacity until February 28, 1933. L. B. Riddle was vice president in charge of production of Deep Rock from May, 1922, until February 28, 1933. The business of Deep Rock from 1924 on was under the management and direction of Gray and Riddle. Each of them owned securities of Deep Rock and neither had any interest in Standard or Byllesby, except that during the year 1928 only Gray served as a director of Standard.

On the organization of Deep Rock, Bernard L. Majewski became division manager of sales of its Illinois-Indiana division. He was connected with the properties under the Shaffer ownership. He became a director and vice president in charge of sales in 1928 and continued in that capacity until February 28, 1933. W. E. Moody was in charge of refinery operations, first under Shaffer and later under Deep Rock. In 1928, he became a director and vice president in charge of the refinery operations. William R. Francisco became associated with Deep Rock in 1919 in charge of auditing, accounting and finance. He became a director and treasurer in 1923 and continued in that capacity until February 28, 1933. O. O. Kerr became associated with Deep Rock at the time of its organization. He became assistant treasurer in 1922 and continued in that capacity until February

28, 1933. Moody, Francisco and Kerr were not interested in or officially associated with Standard or Byllesby.

Deep Rock was not organized as a department of Standard. Each kept separate and distinct corporate records and books and the properties and assets of the former were not commingled with those of the latter. Deep Rock paid its own officers and employees. The offices of Deep Rock were first maintained at Chicago. Soon after Mr. Gray became executive vice president and general manager they were moved to Tulsa, Oklahoma. The officers at Tulsa held frequent consultations with the officers and directors of Deep Rock in Chicago upon questions of acquiring additional gasoline stations, oil and gas leases, and other oil properties, and with reference to financing and general business policies. These conferences were consultive in character. The officers at Tulsa were in actual charge of the operations and affairs of Deep Rock and were not dictated to by Standard or its officers. At these meetings the annual budget of Deep Rock was gone over, its financial requirements considered, and on requests of the Tulsa officials, Standard made frequent advances and loans of funds to Deep Rock. But for its ability to borrow from Standard, Deep Rock's liquid funds would not have been sufficient to take care of the cost of expansion and current requirements.

In 1922 and 1923, on the recommendation of Riddle, and by the use of funds advanced by Standard, which amounted in the aggregate to $2,544,591.00, Deep Rock acquired certain producing properties and built a cracking plant thereon which became an important part of Deep Rock's refinery operations. The legal title to such properties, hereinafter referred to as the Refining Company properties, was transferred to J. C. Kennedy, as trustee, and Deep Rock was charged with the funds advanced by Standard. On February 26, 1923, Deep Rock Oil & Refining Company, hereinafter called the Refining Company, was organized under the laws of Delaware with an authorized capital stock of 15,000 shares without par value. Later as the result of transactions reflected on the books of the three corporations, Standard became the owner of the entire capital stock of the Refining Company and its unsecured note in the sum of $1,894,592.11, and Deep Rock was credited with $2,544,591.00 expended in the acquisition of the Refining Company properties. Deep Rock retained $1,619,398.88 realized

from the previous operation of the Refining Company properties, and in October, 1925, leased them from the Refining Company at a rental of $75,000.00 per month for the first three months and $50,000.00 per month thereafter. The lease was renewed December 20, 1930. Thereafter, the Refining Company declared dividends on its stock payable to Standard equal to the rent due to the Refining Company from Deep Rock. Deep Rock did not pay the rentals as they accrued. Standard charged Deep Rock therewith on open account and credited the Refining Company with equivalent amounts as dividends received. In all the transactions between Deep Rock and Standard, the transfer of the Refining Company stock to Standard and the lease of the Refining Company properties to Deep Rock at a very large rental is the only instance where it can be said Standard exercised its control to the benefit of Standard and to the detriment of Deep Rock.

When the $10,000,000.00 of 6 per cent Deep Rock notes were issued and sold in 1928, Standard surrendered its claim against Deep Rock for $11,086,195.85 determined as of February 24, 1928, 90,000 shares of Deep Rock 7 per cent preferred stock and 40,000 shares of Class A common stock, and received in lieu thereof 442,448 shares of Deep Rock common stock. These transactions improved the position of the 6 per cent notes by the elimination of Deep Rock's indebtedness to Standard and improved the position of the other holders of preferred stock by the elimination of the preferred stock held by Standard, and resulted in substantially no benefit to Standard as a common stockholder since it already owned substantially all of the outstanding common stock of Deep Rock.

Thereafter, Standard continued to make advances to Deep Rock and the latter made payments on account from time to time.

On February 28, 1933, Gray and Riddle filed in the district court of Tulsa County, Oklahoma, a proceeding in equity against Deep Rock, Standard, the Refining Company, and the Oklahoma Gas & Electric Company, and prayed for the appointment of a receiver for Deep Rock.[1]

On the day the bill was filed the state court appointed a receiver for Deep Rock.

Immediately thereafter the cause was duly removed to the District Court of the United States for the northern District of Oklahoma[1a] and on March 2, 1933, the court appointed H. N. Greis and E. H. Moore coreceivers of Deep Rock.

On August 15, 1933, Standard filed a petition in intervention in the receivership proceeding in which it set up its claim against Deep Rock for $9,342,642.37. All except a relatively small amount of the claim had accrued subsequently to April 12, 1928. On November 28, 1933, the receivers filed their answer and counterclaim to Standard's petition in intervention. They attacked the transfer of the Refining Company stock to Standard and the leases from the Refining Company to Deep Rock and averred that Deep Rock, the Refining Company, and the Management Corporation were and at all times had been mere agents, instrumentalities, and adjuncts of Standard organized and utilized by Standard for the purpose of transacting its business in Oklahoma and prayed that the separate corporate entities be disregarded and Standard adjudged indebted to Deep Rock in the sum of $8,756,719.50. The court appointed Honorable Preston C. West special master to hear the Standard claim and the counterclaim of the receivers.

On June 19, 1934, Deep Rock filed its petition under sections 77A, 77B of the Bankruptcy Act, 11 U.S.C.A. §§ 206, 207 and note. On the same day the court approved the petition and appointed Greis temporary trustee. On July 9, 1934, it appointed Greis as permanent trustee. On June 22, 1934, Standard filed its proof of claim in the bankruptcy proceeding. The trustee renewed the challenge he had asserted as receiver. The claim was again referred to West as special master with instructions to take the evidence and report it with his findings of fact and conclusions of law to the court.

Extensive hearings were conducted before the special master throughout 1934 and the early months of 1935. Witnesses were examined at Chicago and Tulsa. Elaborate interrogatories were prepared by Messrs. Ramsey, de Meules, Martin and Logan,[2] counsel for the receivers and later for the trustee, and were presented to and answer-

---

[1] Shortly after the institution of the suit it was dismissed as to all the defendants except Deep Rock.

[1a] For brevity hereinafter referred to as "the court."

[2] Judge George S. Ramsey was leading counsel for the receivers and later for the trustee.

ed by various officials and agents of both Standard and Deep Rock. An extensive stipulation, accompanied by 28 exhibits, was entered into between counsel for the trustee and Standard. The witnesses for Standard evidenced no disposition to suppress any material fact.

The $10,000,000.00 note issue and the preferred stock of Deep Rock had been sold by Byllesby, Janney & Company, and the Federal Securities Corporation. In 1932, Deep Rock engaged Byllesby for a reasonable consideration to endeavor to arrange for extending the maturity of the notes from March 1, 1933, to March 1, 1937. Byllesby was engaged in this undertaking when the receivership proceeding was instituted and had procured extension agreements from more than 78 per cent in amount of the holders of such notes. Upon the institution of the receivership Byllesby determined to form a reorganization committee. The committee consisted of John J. Shinners, vice president of Byllesby, Robert F. Holden, vice president of Janney & Company, Newton P. Frye, president of the Central Republic Company of Chicago, and formerly vice president of the Federal Securities Corporation, G. M. P. Murphy, a prominent banker of New York City, Albert J. Robertson, vice president of a Des Moines, Iowa, banking institution, and John H. Mason, formerly chairman of the Main Line Trust Company of Ardmore, Pennsylvania. No member of the reorganization committee owned any of the Deep Rock securities. Mason had no interest in or direct connection with Byllesby or Standard. Frye, Robertson, Murphy, and Holden had no interest in or connection with Byllesby or Standard except that they had on occasions acted with Byllesby in syndicates underwriting and selling securities. The committee employed independent counsel wholly disassociated with Byllesby and Standard.

The committee recognized that the validity and extent of the Standard claim was an important element in the formulating of any plan of reorganization. It made no effort to secure deposits of notes and preferred stock under the terms of the conventional deposit agreement. It proceeded at once with an independent and careful study of the relationship and transactions between Deep Rock, Standard, Byllesby, the Management Corporation, and the Refining Company. With the aid of its counsel and accountants the committee reviewed the history of the Standard claim, the effect of the 1928 settlement, the basis and legitimacy of the items constituting the claim, and the legal principles and issues involved. In 1934, counsel for the committee advised its members that Standard would have to be considered in any reorganization plan, since in their opinion the instrumentality rule was not applicable and Standard could establish a claim in the approximate amount of $7,300,000.00.

In August, 1934, more than 18 months after the inception of the receivership proceeding, the committee concluded that a reorganization plan should be submitted to the security holders in a form that might be susceptible of consummation promptly upon the determination of the Standard claim. In August, 1934, the committee intervened in the bankruptcy proceeding and filed a deposit agreement together with a proposed plan of reorganization. After due notice to all creditors and security holders, the deposit agreement was adjudged by the court to be fair and its terms and provisions were approved. The committee was authorized to solicit deposit of Deep Rock notes and preferred stock in acceptance of the proposed plan of reorganization. The plan was proposed by Deep Rock as debtor. It was predicated upon the allowance of the Standard claim for at least $5,000,000.00, of which a substantial amount was to rank on a parity with the Deep Rock notes. The plan specifically provided that whatever might be determined by the court as to the validity, extent and rank of the Standard claim all noteholders who had theretofore deposited with the committee would be accorded an opportunity to withdraw without expense after being informed of the result of the adjudication of the Standard claim.

On February 22, 1935, six months after the submission of the original plan, Messrs. John M. Taylor and William H. Taylor, who were then the owners of 550 shares of preferred stock, intervened in the proceeding. A large number of noteholders and preferred stockholders had then accepted the original plan and had deposited their securities with the reorganization committee.

There soon began insistent demands by the depositors that the legal proceedings be terminated and the reorganization completed. In February, 1935, Mr. Shinners called upon Judge Ramsey, counsel for the trustee, and inquired whether there was any basis on which a compromise of the Standard claim could be effected. Judge Ramsey refused to consider the question of

compromise until the proofs were completed. The evidence was closed on February 13, 1935. Mr. Shinners then proceeded with his efforts to induce Standard and its counsel and the trustee and his counsel to arrive at a compromise. As a result Standard addressed an offer of compromise to the trustee providing for the allowance of the Standard claim in the aggregate amount of approximately $5,000,000.00, approximately $3,500,000.00 thereof to rank on a parity with the noteholders. On March 8, 1935, the trustee filed a petition reporting the offer to the court and requesting authority to accept it. In his petition for approval the trustee stated that he had given careful consideration to the offer of compromise and had consulted his counsel, that many debatable questions of law and fact were presented, and that he believed the offer to be fair and its acceptance for the best interests of the estate.

The court referred the petition and the question of the approval of the compromise to West as special master. The special master gave due and ample notice to the creditors and stockholders of the hearing on the offer of compromise. Judge Ramsey prepared and filed with the special master a narrative statement of the evidence on the Standard claim and an exhaustive brief on the issues presented, both of fact and law. The Taylors filed objections to the offer of compromise predicated on the defenses asserted by the trustee against the allowance of the claim. A hearing was held before the master on March 25, 1935. After a lapse of six weeks the special master filed his report in which he carefully considered all the pertinent matters, found that the factual and legal issues were debatable, that the compromise was fair, that its acceptance was for the best interests of the estate, and strongly recommended its approval.

The master's report came on for hearing before the court on June 3 and September 23, 1935. The Taylors appeared and objected to approval of the report. After careful consideration the court refused to approve the compromise. The refusal was not predicated on the ground that the claim should not be compromised, but rather on the proposition that the compromise and the plan were definitely related; that the compromise should be made an integral part of the plan, and that considered together the offer was not fair. On September 23, 1935, the court entered an order denying the trustee's petition and directed the parties to continue their efforts to effect a compromise.

On September 27, 1935, the district court of the United States for the District of Delaware acquired jurisdiction over Standard in a proceeding under section 77B of the Bankruptcy Act.

About January 1, 1936, the reorganization committee informally reported to the court in the presence of counsel for the trustee, Standard, and the Taylors, a new offer of compromise of the Standard claim and an amended plan of reorganization. Early in January, 1936, the court informally referred the new proposal of compromise and amended plan to a committee consisting of Judge Ramsey, representing the trustee, N. A. Gibson, Esq., representing Standard, and Travis I. Milsten, Esq., representing the Taylors, with the request that they consider and report thereon. A divided report was filed, Messrs. Ramsey and Gibson favoring the new proposal of compromise and amended plan and Mr. Milsten opposing them. Upon receipt of the report of the informal committee and on February 17, 1936, the court entered an order directing the reorganization committee to submit an amended plan of reorganization and as an integral part thereof a new offer of compromise of the Standard claim authorized by the Delaware court. On November 2, 1936, the Delaware court entered an order authorizing Standard to submit the new offer of compromise and to accept the amended plan.

On November 9, 1936, Deep Rock, with the approval of the court, made amendments to the plan originally proposed in August, 1934, and Standard presented its new offer of compromise. The court set the hearing on the new offer of compromise and amended plan for December 12, 1936, directed the reorganization committee to submit the amended plan and new offer of compromise to the creditors and stockholders of Deep Rock, and to advise those who had accepted the original plan that they were entitled to withdraw their securities without expense on or before December 5, 1936, failing which they would be deemed to have accepted the amended plan and new offer of compromise.

The new offer of compromise provided for the allowance of the Standard claim as follows:

(a) The sum of $2,376,076.31, being the principal amount, after allowing Deep Rock credit for payments made by it,

paid by Standard to third parties not affiliated with Standard for the account of Deep Rock since February 24, 1928, for which Deep Rock was legally obligated to such third parties.

(b) The sum of $1,585,485.18, being the amount actually expended by Standard in the purchase and development of the Refining Company properties, less rentals which accrued prior to the 1928 settlement, for which Standard received common stock.

(c) Interest on $2,376,076.31 embraced in item (a) at the rate of 5 per cent per annum from February 28, 1933, to the date of approval of the compromise, and on item (b) at the rate of 5 per cent per annum from August 5, 1933, to the date of approval of the compromise.

(d) $1,500,000.00 of the aggregate amount in items (a) and (b) to rank on a parity with the Deep Rock notes.

It further provided that Standard should transfer to the trustee of Deep Rock the entire issued and outstanding capital stock of the Refining Company, and that R. J. Graf, trustee, who had succeeded Kennedy as trustee, should execute and deliver to the trustee of Deep Rock good and sufficient transfers and conveyances of the Refining Company properties. It was conditioned on the approval of a plan of reorganization on or before February 8, 1937.

The new offer eliminated all questionable items in the Standard claim which the trustee and his counsel felt were subject to disallowance on their merits.

The amended plan as later modified by the court provides that the new securities of Deep Rock shall consist solely of income debentures and common stock; that the noteholders shall receive $10,000,000.00 of new 6 per cent income debentures, cash in the amount of $1,200,000.00, plus an amount equal to 6 per cent per annum on the principal amount of their notes from January 1, 1937, to the date of the new income debentures, and approximately 7 per cent of the new common stock; that Standard shall receive in full satisfaction of its claim approximately 73 per cent of the common stock; and that the preferred stockholders shall receive approximately 20 per cent of the new common stock.

It will be observed that Standard is wholly eliminated as a creditor and the noteholders and other creditors are to receive cash and the highest ranking security.

Pursuant to the order of November 9, 1936, the reorganization committee furnished to the creditors and stockholders of Deep Rock a complete report on the amended plan of reorganization. It set forth the terms of the amended plan, the differences between it and the original plan, the terms of the new offer of compromise, the tentative appraisal of the trustee and a complete statement of the earnings and financial history of Deep Rock since the announcement of the original plan in August, 1934. It advised the depositors, both noteholders and preferred stockholders, of their right to withdraw their securities from deposit with the reorganization committee without expense if they did not wish to accept the amended plan or to approve the new offer of compromise.

In the meantime, an independent committee had been organized by the Taylors. On November 16, 1936, the independent committee circularized the owners of preferred stock, urging them to withdraw from their deposits with the reorganization committee and authorize the independent committee to represent them in opposing the approval of the amended plan and new offer of compromise, and stating that such representation would be without individual liability for any expense.

The amended plan was approved by Standard Statistics Company, Inc., and Moody's Investor Service, nationally recognized investment analysts.

The hearing on the amended plan and the new offer of compromise came on before the court on December 12, 1936. The independent committee was permitted to intervene. The court went into the matters thoroughly and exhaustively. Judge Ramsey had testified before the special master at the hearing on the original offer that the assets of Standard and Deep Rock had not been commingled; that each had kept separate corporate records and books; that the local officers at Tulsa had been in charge of the producing and refining operations of Deep Rock, that Standard had handled Deep Rock's finances, and that Standard had not undertaken to tell Deep Rock how to operate its properties; and that after deliberate consideration it was his view that the issues of fact and law were so debatable and the ultimate result of the contest so doubtful as to justify acceptance of the

original offer of compromise. At the hearing before the court on the amended plan and new offer of compromise Judge Ramsey explained the new offer of compromise and the items that went into it in detail; he stated in substance that under the compromise all fraudulent rental charges and all items contested by the trustee in the Standard claim had been eliminated; that the items that went to make up the Standard claim aggregated in excess of $12,000,-000.00; that unless the instrumentality rule should be applied by the courts, the claim would probably be allowed at approximately $6,000,000.00; that Deep Rock was not originally organized as a department or agency of Standard; that each kept separate and distinct corporate records and books; that their assets were never commingled; that he entertained serious doubt that the instrumentality rule would be applied by the courts; that he did not think it good judgment "to bet six or seven million dollars that the courts will uphold the instrumentality rule"; and that it was his judgment after full and deliberate consideration the offer of compromise should be approved.

Counsel for the reorganization committee representing in excess of 80 per cent of the noteholders and 60 per cent of the preferred stockholders in amounts also urged the court to approve the new offer of compromise.

■ Judge Ramsey has had a long, honorable and distinguished career at the bar. For many years he has been recognized as one of the eminent lawyers of the Southwest. The special master is a lawyer of ability and long experience. For many years he was the head of a leading firm of lawyers at Tulsa, Oklahoma. Counsel for the reorganization committee are counsel of high standing and ability. They were in a position to exercise an unbiased and independent judgment. Plainly the advice and recommendation of such eminent counsel were not lightly to be disregarded. On the contrary, the court was justified in giving great weight thereto in reaching his ultimate determination.

On December 22, 1936, the court entered two conditional orders, one of which approved the compromise of the Standard claim conditioned on the final confirmation of the plan, and the other confirmed the amended plan as modified by the terms of the order, conditioned upon the acceptance of the amended plan as modified, by the holders of the requisite percentage of notes and preferred stock and by Standard.

Following the order of December 22, 1936, the reorganization committee advised the creditors and stockholders of Deep Rock of the modification of the amended plan made by that order and notified the depositors that they could withdraw without expense if they did not wish to accept the amended plan as modified.

On February 3, 1937, Standard, acting under authority of an order of the Delaware court made January 27, 1937, accepted the amended plan as modified.

On February 3, 1937, approximately 20 per cent in amount of the preferred stockholders, acting through · the independent committee, had disapproved, and approximately 60 per cent in amount of such stockholders, acting through the reorganization committee, had expressly approved the amended plan as modified and the new offer of compromise, and the remaining 20 per cent·by inaction had tacitly manifested their approval thereof; and 82 per cent of the noteholders had expressly approved such plan and compromise, and no noteholder had objected thereto.

On February 3, 1937, a further hearing was had at which additional objections and testimony were presented by counsel for the independent committee. After the hearing the court entered its final order confirming the amended plan as modified and as a part thereof approved the offer of compromise of the Standard's claim.

The trustee, with the assistance of the Deep Rock technical staff, made an appraisal of the physical properties of Deep Rock as·of September 1, 1936, and fixed the value thereof at $9,508,848.37. The value as fixed included going concern value, each unit being valued as an integral part of a complete and going concern.

The consolidated balance sheet of October 31, 1936, the value of physical assets included therein being based on the above appraisal, showed the total value of assets, after cash and liquid assets were added and current liabilities deducted, to be $16,-847,348.37.

O. J. Berend, a qualified expert, checked the methods employed, the factors considered, and the results obtained by the trustee's appraisal and approved the same.

C. J. Smith, a witness called by the independent committee, gave as his opinion

that the physical assets of Deep Rock as a going concern had a value of $13,-600,000.00. He admitted, however, that he was not qualified to value the producing properties. His estimate was based wholly on the capitalization of current earnings.

The court found that the value of the properties of Deep Rock was not in excess of $17,000,000.00.

Counsel for the independent committee devoted 275 pages of their inordinate brief to the proposition that the Standard claim should be disallowed on the merits.

■ The independent committee in effect asks us to adjudicate the merits of the Standard claim and then in the light of that adjudication consider retrospectively the action of the court in approving the compromise. In seeking that approach the independent committee takes no risk. If we should decide adversely to the claim on the merits, then they ask us to disapprove the compromise. If we should decide in favor of the claim on the merits, they are insulated against injury by the compromise agreement. The unfairness of such an approach is manifest. Clearly whether Standard was entitled to the allowance of its claim on the merits is not the issue here presented. That issue was never passed on by the special master or the court. The real issue is whether the plan meets the requirements of section 77B (b) (e) (f) of the Bankruptcy Act, as amended, 11 U.S.C.A. § 207 (b) (e)°(f), and is fair and equitable, and whether the court abused its discretion in approving the offer of compromise.

■ Whether a proposed compromise of a claim against a debtor shall be approved rests in the sound discretion of the trial court. Its action in approving a compromise is presumptively right and, absent a

clear showing of an abuse of discretion, will not be set aside on appeal.[3]

We shall consider the merits of the claim only to the extent necessary to determine whether the issues of fact and law were reasonably debatable; whether the claim was so clearly invalid as to afford no substantial basis for a compromise.

■ The factors to be considered are: The amount of the compromise; the participation of Standard in the new securities under the amended plan as modified; the amount of the probable allowance in the event Standard should succeed in establishing its claim;[4] the participation Standard would be accorded if its claim should be established; the uncertainty of the outcome of the contest over the claim; the time already consumed in litigation of the claim; the time it would probably take to litigate it to final determination; the delay and inconvenience of prolonged litigation; the adverse effect on the interests of creditors and stockholders of long continued administration of a business by a trustee under the supervision of the court;[4a] the fact that the compromise set aside the only transaction where Standard control resulted in benefit to Standard and detriment to Deep Rock and eliminated all doubtful and debatable items from the claim; and the fact that more than 60 per cent in amount of the preferred stockholders and 82 per cent in amount of the noteholders, after being fully informed of the relevant facts, approved the compromise and only slightly in excess of 20 per cent in amount of the preferred stockholders opposed it.

Judicial precedents have not yet defined the instrumentality rule with a degree of certainty that it can be applied as a precise yardstick in the admeasurement of legal rights.[5]

[3] Pullman Couch Co. v. Eshelman, 4 Cir., 1 F.2d 885, 887, 888; Drexel v. Loomis, 8 Cir., 35 F.2d 800, 807; In re Riggi Bros. Co., 2 Cir., 42 F.2d 174, 176; Remington on Bankruptcy, vol. 2, § 1152; Id., Supp., §§ 1147, 1152.50.

[4] A rescission of the November, 1928, transactions between Deep Rock, Standard and the Refining Company would increase the Standard claim $2,544,591.11 because the Standard would be entitled to a return of the funds advanced by it to acquire the Refining Company properties.

[4a] A disposition of the Standard claim

was a prerequisite to the consummation of any plan of reorganization. The contest over the claim had already resulted in long delay in the consummation of reorganization and a continuation of the contest to final adjudication meant much more delay.

[5] Mr. Elvin R. Latty, Professor of Law at the University of Missouri, in his book entitled "Subsidiaries and Affiliated Corporations," after discussing the state of the decisions on the instrumentality rule, concludes:

"Until we get judicial expressions about the specific policy-factors which are the

As stated by Mr. Justice Cardozo in Berkey v. Third Ave. Ry. Co., 244 N.Y. 84, 155 N.E. 58, 61, 50 A.L.R. 599:

"The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor."

There is respectable authority for the proposition that to justify the application of the instrumentality rule between parent and subsidiary corporation, there must be present in addition to the elements of control through stock ownership and common directorates and officers, elements of fraud or wrongdoing on the part of the parent corporation to the detriment of the subsidiary and third persons in their relations with the subsidiary.[5a]

Sections 5 and 6 of Powell on Parent and Subsidiary Corporations, in part, read:

"The Instrumentality Rule, in its shortest form, may now be stated:

"So far as the question of control alone is concerned, the parent corporation will be responsible for the obligations of its subsidiary when its control has been exercised to such a degree that the subsidiary has become its mere instrumentality.

"The Instrumentality Rule is recognized in all jurisdictions in this country and our problem therefore is to determine the circumstances which render the subsidiary an 'instrumentality' within the meaning of the decisions. This is primarily a question of fact and of degree."

"The circumstances rendering the subsidiary an instrumentality. It is manifestly impossible to catalogue the infinite variations of fact that can arise but there are certain common circumstances which are important and which, if present in the proper combination, are controlling. These are as follows:

"(a) The parent corporation owns all or most of the capital stock of the subsidiary.

"(b) The parent and subsidiary corporations have common directors or officers.

---

underlying considerations involved in a decision allowing or refusing to a claimant of a corporation recovery against the parent or other related corporations, the basis of predictability will continue unsatisfactory. So long as the technique resorted to, when recovery is denied, is to assert that a corporation is something separate and distinct from the stockholder, and where recovery is allowed, to assert that the corporation is not separate and distinct when it is so controlled and dominated as to be a mere instrumentality, we may continue to expect confusion. Armed with these two verbally conflicting major premises, any court can reach either result in the typical parent-subsidiary situation and still leave us no nearer enlightenment than before."

[5a] New York Trust Co. v. Carpenter, 6 Cir., 250 F. 668; Duffy v. Treide, 4 Cir., 75 F.2d 17; Finn v. George T. Mickle Lumber Co., 9 Cir., 41 F.2d 676, 678; Wheeler v. Smith, 9 Cir., 30 F.2d 59, 60; Majestic Company v. Orpheum Circuit, 8 Cir., 21 F.2d 720, 724; In re Watertown Paper Company, 2 Cir., 169 F. 252, 257; Peckett v. Wood, 3 Cir., 234 F. 833; Owl Fumigating Corporation v. California Cyanide Co., D.C.Del., 24 F.2d 718, 719, 720; Forbush Co. v. Bartley, 10 Cir., 78 F.2d 805, 808; McCurdy v. Spokane Western Power & Traction Co., 174 Wash. 470, 24 P.2d 1075, 1083; Fickling Properties, Inc., v. Smith, 123 Fla. 556, 167 So. 42, 43; Jefferson County Burial Soc. v. Cotton, 222 Ala. 578, 133 So. 256, 259; In re Greenwald's Estate, 19 Cal.App.2d 291, 65 P.2d 70, 72;

Garvin v. Matthews, Wash., 74 P.2d 990, 992; Finley v. Union Joint Stock Land Bank of Detroit, 281 Mich. 214, 274 N.W. 768, 769; Irish v. Bahner, Tex.Civ.App., 109 S.W.2d 1023, 1025; Dos Pueblos Ranch & Improvement Co. v. Ellis, 8 Cal. 2d 617, 67 P.2d 340, 342.

See cases cited in note 6.

In Don Pueblos Improvement Company v. Ellis, supra, 8 Cal.2d 617, 67 P.2d 340, at page 342, the court said:

"In order to cast aside the legal fiction of distinct corporate existence as distinguished from those who own its capital stock, it is not enough that it is so organized and controlled and its affairs so managed as to make it 'merely an instrumentality, conduit or adjunct' of its stockholders, but it must further appear that they are the 'business conduits and alter ego of one another,' and that to recognize their separate entities would aid the consummation of a wrong."

In Finley v. Land Bank of Detroit, supra, 281 Mich. 214, 274 N.W. 768, at page 769, the court quoted with approval from the article of Mr. Ballantine, in 60 American Law Review, pp. 19, 28, as follows:

" 'But to justify treating the sole stockholder or holding company as responsible it is not enough that the subsidiary is so organized and controlled as to make it "merely an instrumentality, conduit or adjunct" of its stockholders. It must further appear that to recognize their separate entities would aid in the consummation of a wrong.' "

See, also, Parent and Subsidiary Corporations, Powell, § 12, pp. 40-54.

"(c) The parent corporation finances the subsidiary.

"(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

"(e) The subsidiary has grossly inadequate capital.

"(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

"(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

"(h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

"(i) The parent corporation uses the property of the subsidiary as its own.

"(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

"(k) The formal legal requirements of the subsidiary are not observed."

Counsel for the independent committee assert that ten of the indicia of agency or instrumentality enumerated by Powell are present in the instant case. We cannot agree with counsel's conclusion; a, b, c, and d are present in the instant case; f, g, i, j, and k are absent; e and h may be said to be fairly debatable.

While Standard brought about the organization of Deep Rock it is plain that Deep Rock was not in its inception a department or instrumentality of Standard so that indicium d becomes of little significance.

The fact that one corporation owns a majority of the stock of another and through its stock control selects from its own directors and officers a majority or all of the directors and officers of the other corporation, without more, does not justify the application of the instrumentality rule.[6]

The parent corporation is the natural source of the subsidiary's credit. Hence, the fact that the parent corporation finan-

---

[6] Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 487; Bee Bldg. Co. v. Daniel, 8 Cir., 57 F.2d 59, 61; Texas Company of Mexico, S. A., v. Roos, 5 Cir., 43 F.2d 1, 15; In re Fox West Coast Theatres, 9 Cir., 88 F.2d 212, 228, 229; Gillis v. Jenkins Petroleum Process Company, 9 Cir., 84 F.2d 74, 79, 80; Shepherd v. Banking & Trust Co. of Jonesboro, 6 Cir., 79 F.2d 767, 769; Menihan v. Commissioner, 2 Cir., 79 F.2d 304, 305, 306; City of Holland v. Holland City Gas Co., 6 Cir., 257 F. 679, 684, 685; Peterson v. Chicago, R. I. & P. Ry. Co., 205 U.S. 364, 390, 391, 392, 27 S.Ct. 513, 51 L.Ed. 841; Pullman's Palace Car Co. v. Missouri Pac. Ry. Co., 115 U.S. 587, 6 S.Ct. 194, 29 L.Ed. 499; Pacific Can Co. v. Hewes, 9 Cir., 95 F.2d 42, 46; Kentucky Electric Power Co. v. Norton Coal Mining Co., 6 Cir., 93 F.2d 923, 926.

In Kentucky Electric Power Co. v. Norton Coal Mining Company, supra, the court said:

"On the other hand, it is likewise well settled that a corporation is ordinarily an entity, separate and apart from its stockholders, and mere ownership of all the stock of one corporation by another, and the identity of officers of one with officers of another, are not alone sufficient to create identity of corporate interest between the two companies or to create the relation of principal and agent or to create a representative or fiduciary relationship between the two. If such stock ownership and potential control be resorted to only for the purpose of normally participating in the affairs of the subsidiary corporation in a manner usual to stockholders and not for the purpose of taking some unfair advantage of the subsidiary or using it as a mere adjunct to the main corporation or as a subterfuge to justify wrongdoing, their identity as separate corporations will not be disregarded but their respective rights when dealing with each other in respect to their separate property will be recognized and maintained. The extent of stock ownership and mere potential control of one company over another has never been regarded as the determining factor in the consideration of such cases. Something must be disclosed to indicate the exercise of undue domination or influence resulting in an infringement upon the rights of the subservient corporation for the benefit of the dominant one. Otherwise, the rights of the separate corporations in respect to their corporate property must be governed by the rules applicable in ordinary cases."

ces the subsidiary will not render the subsidiary a mere instrumentality of the parent, although stock ownership and common personnel are also present.[7]

 Criticism is leveled at three dividends declared on the common stock of Deep Rock in the years 1926, 1928, and 1930, and credited to Standard. A sufficient answer is that the evidence shows actual earnings available therefor at the times these dividends were declared and furthermore their payment by a Delaware corporation was justified under the wasting asset rule.[8]

 Where corporate control by the parent over the subsidiary through stock ownership and the election of directors and officers is exercised in the manner normal and usual with majority stockholders, distinct corporate entity should be recognized.[9] Where, however, the relations between parent and subsidiary are so intimate, the control of the former over the latter so dominating, and the business and assets of the two so commingled, that the recognition of distinct entity will result in wrong or injustice to third persons, courts should look through the fiction of distinct entity and deal with the situation as justice requires.[10]

 Having in mind the uncertainty with respect to the instrumentality rule and its application to particular facts, that Deep Rock was not organized as a department of Standard, that the two corporations were engaged in wholly unrelated businesses, that each kept separate and distinct corporate records and books, that their assets were not commingled, that setting aside the only transaction where Standard control resulted in benefit to Standard and detriment to Deep Rock would increase rather than decrease the claim, that the other transactions between the two corporations resulted in benefit to Deep Rock and hence in no injury to the preferred stockholders, that the local officers of Deep Rock had a large part in the management of its operations and affairs, and that eminent counsel for the trustee and the learned special master believed the issues of fact and law debatable and recommended approval of the compromise, we cannot say the result of the contest over the claim was not so doubtful or the claim itself so devoid of merit as to form no reasonable justification for the compromise. Each of the other pertinent factors afforded strong support for the court's action in approving the compromise.

The fairness of the plan is attacked on the ground of the alleged improper approval of the compromise of the Standard claim and a challenge of the correctness of the appraisal.

 On an appeal from a confirmation of a plan the review is limited to issues of law.[11] A finding of value is a finding of fact.[12]

---

7 Owl Fumigating Corporation v. California Cyanide Co., D.C.Del., 24 F.2d 718, 720; Peterson v. Chicago, R. I. & P. Ry. Co., 205 U.S. 364, 393, 27 S.Ct. 513, 51 L.Ed. 841; City of Holland v. Holland City Gas Co., 6 Cir., 257 F. 679, 684; Parent and Subsidiary Corporations, Powell, p. 11.

8 Fletcher's Cyc. of Corporations, Perm. Ed., vol. 11, § 5347; General Corporation Act of Delaware, § 34, Rev.Code Del. 1935, § 2066; Wittenberg v. Federal Mining & Smelting Co., 15 Del.Ch. 351, 138 A. 352.

9 United States v. Reading Company, 253 U.S. 26, 62, 63, 40 S.Ct. 425, 434, 64 L.Ed. 760; Chicago, M. & St. P. Ry. Co. v. Minneapolis C. & C. Ass'n, 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229.

10 See cases cited in Note 5a; Fletcher's Cyc. of Corporations, Perm. Ed., vol. 1, § 43; Parent and Subsidiary Corporations, Powell §§ 7, 13.

See New York Trust Co. v. Carpenter, 6 Cir., 250 F. 668, 673, 674–676, where the court said:

"Whatever 'adjunct' may mean in this connection, it must, to be applicable at all, be given a new definition, involving the idea of sinister purpose or wrongful results. If it means agency or instrumentality in the sense of means to effect wrong, or through which wrong is done, we would be content with it. But it is a word too uncertain in meaning to be incorporated into an inexorable rule of law as an exception to a just rule long established unless qualified in such a way as to cover the kind of cases to which it was intended to apply; cases in which adherence to the doctrine of the separate and distinct entity of a corporation would work injustice."

11 Meyer v. Kenmore Granville Hotel Company, 297 U.S. 160, 166, 56 S.Ct. 405, 407, 80 L.Ed. 557; Campbell v. Alleghany Corporation, 4 Cir., 75 F.2d 947, 955; In re 620 Church Street Corporation, 299 U.S. 24, 27, 57 S.Ct. 88, 89, 81 L.Ed. 16.

12 In re Pittsburgh Hotels Corporation, D.C.Pa., 17 F.Supp. 949, 952; In re 620 Church Street Corporation, supra.

■ The finding of value by the trial court is clearly supported by the evidence. The appraisal was made by the trustee, assisted by the technical staff of the Deep Rock organization, and was approved after a careful check by an independent expert, Mr. Berend. There was no showing that in making the appraisal any pertinent factor was disregarded. Due consideration was given to going concern value. The court was entitled to accept and act on such appraisal. In re Consolidation Coal Company, D.C.Md., 11 F.Supp. 594, 597.

The sole proof offered by the independent committee attacking the appraisal was that of Mr. Smith who frankly admitted he was not qualified to appraise the value of the producing properties. His appraisal was based solely on capitalization of earnings and on an arbitrary allowance for depletion demonstrably inadequate.

If, as we have held, the compromise of the Standard claim was properly approved, then it, together with the indebtedness due the noteholders, was in excess of the valuation of the assets of Deep Rock.

■ Since the aggregate of the allowable claims of creditors exceeded the fair value of the assets of Deep Rock a plan under which the preferred creditors received 20 per cent of the common stock, Standard, a creditor, 73 per cent of the common stock, and the noteholders, creditors, 7 per cent of the common stock, was manifestly not unfair to the preferred stockholders.

The orders appealed from are accordingly affirmed.

WILLIAMS, Circuit Judge (concurring).

I concur with the conclusion reached by Circuit Judge PHILLIPS to affirm the orders of the trial court, but in so doing, it is not to be understood that I express any opinion as to whether the Deep Rock Oil Corporation was an instrumentality of the Standard Gas and Electric Company.

The special master found that the factual and legal issues were debatable; that the compromise was fair; that its acceptance was for the best interest of the estate, and recommended its approval.

For a number of years he was solicitor for the Interior Department in Washington, D. C., the same position formerly held by the Honorable Willis Van Devanter, Justice of the Supreme Court of the United States. He is also a former president of the Oklahoma Bar Association, and one of the leading lawyers of the state.

The attorney for the trustee is a former member of the Supreme Court of Oklahoma, also a former president of the Oklahoma Bar Association, and one of the leading lawyers of the state.

In oral argument before the court on this hearing, he stated that in his opinion the factual and legal issues were debatable and that caused him to recommend that the proposed compromise be accepted. The trial court approved same.

Section 77B, 11 U.S.C.A. § 207 and notes, was enacted in legislation to rehabilitate business.

No fraud appears in the record.

I conclude that the orders of the lower court should here be affirmed.

BRATTON, Circuit Judge (dissenting).

The allowance of the claim of Standard in the sum of approximately $5,000,000, and the approval of the plan of reorganization with the claim included as a liability were challenged in the court below and the contentions are renewed here. Appellants argue in connection with the first contention that at all material times Deep Rock was a mere agent, department, or instrumentality of Standard, and hence the latter cannot assert a claim for any amount in this proceeding.

Standard and Deep Rock are separate corporate entities, but it is well settled that the fiction of corporate entity should be disregarded when it is necessary to circumvent fraud or uproot a harbor for wrong. Boatright v. Steinite Radio Corporation, 10 Cir., 46 F.2d 385; Maloney Tank Mfg. Co. v. Mid-Continent Petroleum Corporation, 10 Cir., 49 F.2d 146; Dunnett v. Arn, 10 Cir., 71 F.2d 912.

Standard owned approximately 98 per cent. of the common stock of Deep Rock. That fact alone and apart from other considerations is not enough to warrant the disregard of their separate juridical entities, or to render Deep Rock the agent, department, or instrumentality of Standard. But where the ownership of stock is not used and employed for the purpose of participating in the affairs of the corporation in the normal and usual manner, but for the purpose of dominating and controlling it in such way and to such

extent that it becomes the mere agency or instrumentality of the parent corporation, courts disregard the fact that they are separate corporate beings and treat the subsidiary as the agent or instrumentality of the parent. United States v. Lehigh Valley R. R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Delaware, Lackawanna & Western R. R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438; Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic Ass'n, 247 U.S. 490, 38 S. Ct. 553, 62 L.Ed. 1229; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; Centmont Corporation v. Marsch, 1 Cir., 68 F.2d 460.

A parent corporation may not assume the position of creditor and assert a claim in bankruptcy against its subsidiary which has been dominated and controlled as a mere adjunct, department, or instrumentality, since the assertion of a claim in such circumstances amounts to the presentation of a claim against itself in fraud of bona fide creditors. Forbush Co. v. Bartley, 10 Cir., 78 F.2d 805; Clere Clothing Co. v. Union Trust & Savings Bank, 9 Cir., 224 F. 363; E. E. Gray. Corporation v. Meehan, 1 Cir., 54 F.2d 223; Centmont Corporation v. Marsch, supra; In re Kentucky Wagon Mfg. Co., 6 Cir., 71 F.2d 802.

There was a league of corporations in this instance. Byllesby was the parent, and the others were subsidiaries, affiliates, and associates. In 1921 Shaffer parted with his interest in Shaffer Oil and Refining Company—subsequently changed in name to Deep Rock—and thereafter Standard owned virtually all of its common stock. The extent of common directors in Byllesby, Standard, Engineering and Management, and Deep Rock in the years 1923 and 1928 appears in the list in the margin.[1] These years are fairly representative of other years from 1921 to 1933, inclusive. All of the officers of Deep Rock for the years 1923 to 1932, inclusive, were likewise officers of Standard for the same years, with the exception of Riddle, Moody, Francisco, Kennedy, Dale, and Kerr. Standard elected all of the directors of

1923

| [1]<br>Byllesby and<br>Co. Directors | Standard<br>Directors | Engineering<br>and Management<br>Corp.Directors | Deep Rock<br>Directors |
|---|---|---|---|
| H.M.Byllesby | H.M.Byllesby | H.M.Byllesby | H.M.Byllesby |
| | | | G.N.Moore |
| R.J.Graf | R.J.Graf | R.J.Graf | R.J.Graf |
| A.S.Huey | A.S.Huey | A.S.Huey | A.S.Huey |
| J.J.O'Brien | J.J.O'Brien | J.J.O'Brien | J.J.O'Brien |
| | | | W.R.Francisco |
| | F.W.Stehr | | F.W.Stehr |
| | J.H.Briggs | | J.H.Briggs |
| H.C.Cummins | H.C.Cummins | H.C.Cummins | H.C.Cummins |
| M.A.Morrison | M.A.Morrison | M.A.Morrison | M.A.Morrison |
| | B.W.Lynch | B.W.Lynch | B.W.Lynch |
| | | | R.K.Huey |
| | | | W.H.Cannady |
| A.S.Cummins | A.S.Cummins | A.S.Cummins | A.S.Cummins |

1928

| Byllesby and<br>Co. Directors | Standard<br>Directors | Engineering<br>and Management<br>Corp.Directors | Deep Rock<br>Directors |
|---|---|---|---|
| J.J.O'Brien | J.J.O'Brien | J.J.O'Brien | J.J.O'Brien |
| R.J.Graf | R.J.Graf | R.J.Graf | R.J.Graf |
| | J.L.Gray | | J.L.Gray |
| M.A.Morrison | M.A.Morrison | M.A.Morrison | M.A.Morrison |
| H.C.Cummins | H.C.Cummins | H.C.Cummins | H.C.Cummins |
| A.S.Cummins | A.S.Cummins | A.S.Cummins | A.S.Cummins |
| | | | W.R.Francisco |
| J.H.Briggs | J.H.Briggs | J.H.Briggs | J.H.Briggs |
| B.W.Lynch | B.W.Lynch | B.W.Lynch | B.W.Lynch |
| | | | R.K.Huey |
| | F.W.Stehr | | F.W.Stehr |
| | | | L.B.Riddle |
| R.G.Hunt | R.G.Hunt | R.G.Hunt | R.G.Hunt |
| | O.G.Corns | | O.G.Corns |
| J.H.Roemer | J.H.Roemer | | J.H.Roemer |

Deep Rock from 1921 to 1932. Meetings of the board of directors were held at the rate of about one per month. Although the operations of Deep Rock were in Oklahoma, all meetings of the board of directors were held in the office of the president of Standard in Chicago; and the minute books of the meetings were kept in that city. The meetings were not merely consultative in character. Instead, all fiscal matters and matters of policy were fixed and determined at them. No important policies were determined and no substantial expenditures were agreed upon without the approval of the president and vice-president of Standard. Cummins was associated with Byllesby for a number of years; he was a director of Standard for fifteen or twenty years; and he became vice-president and general manager of Deep Rock. Standard employed Gray and sent him to Oklahoma to make a report on the property of Deep Rock. He later became president of Deep Rock. The president of Standard made the contract with Gray under which his salary as president was fixed at $36,000 per year plus a share in the profits. Standard approved the employment of Riddle and he later became vice-president in charge of production. Standard dictated and dominated the transaction in which the Bradstreet properties were conveyed to Kennedy, as trustee; and he was trustee for Standard. In like manner, Standard dictated and dominated the transaction relating to the cracking plant; and Graf was trustee for Standard. The board of directors of Deep Rock did not take any action authorizing or otherwise concerning either transaction, and its officers had scant knowledge of the facts. In addition to the manner in which titles were transferred and vested, Deep Rock was required to pay seventy-five thousand dollars per month for three months and fifty thousand dollars per month thereafter under the subterfuge of rentals, all of which reached Standard. Entries on the books of Deep Rock purporting to reflect the transfer to Standard of the corporate stock of Refining Company were subserviently made in conformity with directions of Standard.

Standard furnished large sums of money which Deep Rock needed from time to time in the operation of its business during the period in question. Some of it was used to liquidate obligations, some was deposited in bank to the credit of Deep Rock, and some was used for other purposes. The account on which claim is founded covers a period from 1919 to 1933. It embraces charges aggregating more than fifty-two million dollars, and credits exceeding forty-three million dollars. It discloses that the cash advanced by Standard to Deep Rock during that period was more than seventeen million dollars; that advanced for interest on funded debt exceeded three millions; that advanced for sinking fund requirements exceeded three millions; that advanced with which to pay a note of Deep Rock which Standard had discounted was more than two hundred thousand dollars; that advanced for interest on note of Deep Rock was approximately fifty thousand dollars; that advanced for payment of dividends on preferred stock of Deep Rock owned by the public was approximately two and a half million dollars, while that advanced for payment of dividends on common stock was more than a hundred thousand dollars; that advanced for redemption of the 8 per cent. notes of Deep Rock due in 1941 was about two hundred and fifty thousand dollars; that advanced for federal income taxes of Deep Rock Refining Company was about thirty thousand dollars; that advanced for payment of a note of Deep Rock due Continental National Bank and Trust Company was almost four hundred thousand dollars; that advanced for the purchase of preferred stock of Utility and Industrial Corporation—purchased for Deep Rock—was more than two hundred and seventy-five thousand dollars; and that advanced (by book entries) for payment of compensation for services rendered by Byllesby in procuring deposit of Shaffer notes under an extension agreement was more than one hundred and forty thousand dollars. In addition, the charge made for interest on notes receivable was more than one hundred and eighty thousand dollars; and the charge made for interest on five-year 6 per cent. notes of Deep Rock owned by Standard was more than three hundred and thirty thousand dollars. The debits representing dividends on preferred stock of Deep Rock owned by Standard was slightly more than a million and a half dollars; and the debits representing dividends on common stock exceeded a million and nine hundred thousand dollars. Finally, the charge for cash advanced as sundry expenditures was more than a million dollars. Credits were made from time to time. They exceeded forty-three million dollars, and reduced the balance due ac-

cording to the face of the account to $9,342,642.37—the amount of the original claim. Virtually all of the transactions between the two corporations were evidenced solely and exclusively by debits and credits on the books. Many other pertinent facts appear in the long record before us, but it would not serve any useful purpose to detail them.

The question whether a proposed compromise of a disputed claim against a debtor shall be approved rests very largely in the sound discretion of the trial court, and its action should not be disturbed on appeal in the absence of a clear showing of the improper exercise of such discretion. But here the facts and circumstances and the inferences reasonably and fairly to be drawn from them, considered together, are convincing that at all times after C. B. Shaffer made disposition of his interest in 1921 Standard owned virtually all of the common stock of Deep Rock; that Standard elected the directors of Deep Rock from year to year; that the directors of Deep Rock who were not directors of Standard and the officers and agents of Deep Rock were plainly biddable and subservient to Standard in every respect and were without any measure of independence or freedom; that while Deep Rock was not organized in the first instance as an agency, department, or instrumentality of Standard, that relationship was assumed in 1921 and it was continued until the intervention of receivership in 1933; that Standard took advantage of the relationship thus existing in effecting the transactions concerning the Bradstreet property and the cracking plant; that such transactions were not effected for the benefit of Deep Rock; that the interest of Standard was the dominant motive; that Standard was very substantially enriched through them and they constituted unjust infringement upon the rights of Deep Rock; and that the allowance of the claim in any sum amounts to Standard asserting a claim against itself in legal fraud of others having interest in Deep Rock. Advancements made in these circumstances do not constitute an indebtedness which can be asserted as a claim in a bankruptcy proceeding. Forbush Co. v. Bartley, supra; E. E. Gray Corporation v. Meehan, supra; Centmont Corporation v. Marsch, supra; In re Kentucky Wagon Mfg. Co., supra.

Whether a proposed plan of reorganization shall be approved rests in large measure in the sound judicial discretion of the trial court. But, assuming that the claim of Standard should not have been allowed in any sum, it follows as the night the day that the approval of this plan with the untenable claim included as a liability of the corporation constituted a grave prejudice to the rights of others in interest.

It is respectfully submitted that the claim should have been disallowed in toto; that the proposed plan of reorganization with the claim included should have been disapproved; and that for these reasons the orders should be reversed.