[Civ. No. 1664.   Fourth Appellate District.—February 18, 1937.]

In the Matter of the Estate of NORMAN GREENWALD, Deceased.   THE FIRST NATIONAL BANK IN SANTA ANA (a Corporation), Executor, etc., Respondent, v. E. A. LYNCH, Trustee, etc., Appellant.

Derthick, Cusack & Ganahl and Roland Thompson for Appellant.

Forgy, Reinhaus & Forgy and R. M. Crookshank for Respondent.

MARKS, J.—Harry H. Ball died during the pendency of this appeal. The First National Bank in Santa Ana has been appointed in his place and substituted in his stead.

This is an appeal from a decree of the superior court, sitting in probate, directing that there be charged against a bequest of $15,000 to Preston Duncan, made in the will of Norman Greenwald, deceased, the sum of $12,100 evidenced by a series of promissory notes payable to deceased, some executed by Preston Duncan, and others by Preston Duncan Studios, Ltd., a corporation. The proceeding in the probate

court was brought under the provisions of section 588 of the Probate Code.

The paragraph of the will which is here involved is as follows:

"To Preston Duncan, of Hollywood, California, the sum of Fifteen Thousand Dollars ($15,000.00), and such notes of the said devisee held by me at the time of my death shall be credited against this bequest, and should the said Preston Duncan not survive the distribution of my estate but leave a wife surviving the distribution of my estate, I devise and bequeath said sum on the same conditions to his said wife."

For convenience, we have divided into three classes the seven promissory notes which the court below ordered charged against the bequest. Their respective principal amounts, dates and signatures are as follows: Class 1—$3,000, May 1, 1930, signed Preston Duncan; $1,100, December 1, 1930, signed Preston Duncan. Class 2—$2,000, September 25, 1930, signed Preston Duncan Stu*dois*, Ltd., Preston Duncan. S. Duncan Hyde; $1,000, October 20, 1930, signed Preston Duncan Stu*dois*, Preston Duncan. S. Duncan Hyde; Class 3—$3,000, September 6, 1930, signed Preston Duncan Studios Ltd. By Preston Duncan. S. Duncan Hyde; $1,000, October 31, 1930, signed Preston Duncan Stu*dois* Ltd. By Preston Duncan. By S. Duncan Hyde; $1,000, November 14, 1930, signed Preston Duncan Studios Ltd. By Preston Duncan. By S. Duncan Hyde.

No question is raised here of the correctness of that portion of the decree charging against the bequest to Preston Duncan the notes listed in class 1, the principals of which total $4,100.

No valid objection can be urged against that portion of the decree charging against the bequest to Preston Duncan the notes included in class 2, the principal sums of which total $3,000. Each of these two notes is signed by Preston Duncan in his individual capacity. He is a joint maker and primarily liable for the full amount of the principal and interest on each note. These notes, therefore, clearly come within the definition contained in the quoted paragraph of the will as "such notes of the said devisee held by me at the time of my death" which must be charged against the bequest under the clear and unequivocal language of the will.

The notes in class 3 present a more difficult question. None of them appear to be signed by Preston Duncan in his in-

dividual capacity. On their faces they appear to be notes of Preston Duncan Studios (or Studois) Ltd. These notes have a total principal face value of $5,000.

The theory of the probate court in charging all the notes against the bequest clearly appears in the following findings of fact:

## "III.

"That the said Norman B. Greenwald had loaned Preston Duncan the sum of $12,100.00 prior to his death and had received from the said Preston Duncan notes executed by the said Preston Duncan individually in the principal sum of $7100.00 and notes executed by Preston Duncan Studios Ltd., in the principal sum of $5,000.00

## "IV.

"That Preston Duncan Studios, Ltd., a corporation was the alter-ego of the said Preston Duncan, and the said Preston Duncan owned all of the capital stock of said corporation and all of it stood in his name with the exception of two qualifying shares issued to two directors; that the said corporation transacted the business of the said Preston Duncan.

## "V.

"That it was the intention of the said Norman B. Greenwald that there be credited against the bequest of Preston Duncan not only the notes executed by Preston Duncan individually but the notes executed by Preston Duncan Studios, Ltd., a corporation; that the said Norman Greenwald never made any distinction between the individual and the corporation which was his alter ego, and that the said Norman B. Greenwald considered the notes executed by the said Preston Duncan Studios, Ltd., as the notes of said Preston Duncan an individual.

## "VI.

"That because of the condition of the bequest herein set forth and the fact that Preston Duncan Studios, Ltd., was in fact the alter ego of the said Preston Duncan a latent ambiguity has arisen in the construction of said will."

Appellant is the duly appointed, qualified and acting trustee in bankruptcy of the estate of Preston Duncan, bankrupt. ▮ He attacks as not supported by the evidence those parts of the findings which find that the Preston Duncan Studios, Ltd., was the *alter ego* of Preston Duncan. This contention must be sustained.

The only evidence in the record supporting this portion of the findings is contained in the following stipulation:

"Preston Duncan if present would testify that he owned all but the qualifying shares of the Preston Duncan corporation; that he never discussed the form of the notes or the bequest with Mr. Greenwald; that he never made any objection to the form of the notes; that Preston Duncan never paid any interest and never noted or considered the form of the execution of the notes and that he did not change the form of the execution of the notes for the purpose of defrauding creditors of either Preston Duncan himself or Norman B. Greenwald."

In *Hollywood Cleaning etc. Co.* v. *Hollywood Laundry Service,* 217 Cal. 124 [17 Pac. (2d) 709], it is said:

"Whatever may be the rule in other jurisdictions, the rule is well settled in this state that the mere fact one or two individuals or corporations own all of the stock of another corporation is not of itself sufficient to cause the courts to disregard the corporate entity of the last corporation and to treat it as the *alter ego* of the individual or corporation that owns its stock. In addition it must be shown that there is such a unity of interest and ownership that the individuality of such corporation and the owner or owners of its stock has ceased; and it must further appear that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."

To the same effect is *Davis* v. *Perry,* 120 Cal. App. 670 [8 Pac. (2d) 514], where it is said:

"In any event, the rule of law regarding a so-called 'one man corporation' or as sometimes called a 'corporate *alter ego*' is now definitely announced. The law is well settled that, in order to cast aside the legal fiction of a distinct corporate existence, it must appear that the corporation is the business conduit and *alter ego* of its stockholders, and that to recognize it as a separate entity would aid in the consummation of a wrong. In other words, not only must it appear that one man or two men own the stock and control the policies, but it must also be shown that there is such a unity of interest and ownership that the individuality of such corporation and such person or persons has ceased; and it must further appear from the facts that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."

The evidence supports the necessary element that to fail to recognize the *alter ego* doctrine might work an injustice. But the evidence does not supply the necessary element that Preston Duncan merely used the corporation as a conduit through which to conduct his private business. No such inference can reasonably be drawn from the stipulation.

The finding that there is a latent ambiguity in the will must be examined, and, if such defect exist, we must determine whether the latent ambiguity was cured by the evidence, and whether the finding of a latent ambiguity with the finding of the intention of the testator will support the decree without the aid of the finding that the corporation was the *alter ego* of Preston Duncan.

It is well settled that it is a testator who makes his will, and, when the will is clearly expressed and free from ambiguity and uncertainty it must be held to speak the intention of its maker. The courts cannot rewrite it nor by interpretation can they change the expressed intention of the testator. While this rule is firmly established, cases arise where a will, clear on its face, may present difficulties of interpretation usually developed during the process of administration. Such cases ordinarily present uncertainties as to a beneficiary or of the property bequeathed and are classified as latent ambiguities. "It is settled doctrine that as a latent ambiguity is only disclosed by extrinsic evidence, it may be removed by extrinsic evidence." (*Patch* v. *White,* 117 U. S. 210 [6 Sup. Ct. 617, 29 L. Ed. 860]; *Taylor* v. *McCowen,* 154 Cal. 798 [99 Pac. 351].)

Further rules for construction of wills are thus set forth in *Estate of Koch,* 8 Cal. App. 90 [96 Pac. 100]:

"A will should be so construed as to carry out the desire and intention of the testator if it is possible to do so from the words used. It is also the rule in the construction of a will to interpret it, if reasonably possible, so as to prevent intestacy. As to what were the intentions of a testator in a given case is often a question difficult of solution. Sometimes its final determination is but an approximation. We must take not only the will but its entire scheme; the property disposed of; the persons named as devisees or legatees; the words used, and the context. The technical import of words should not prevail over the obvious intent of the testator; and words should be construed with reference to the surroundings."

During the course of the trial respondent called as a witness in his behalf the attorney who drafted the will of deceased, and over the objection of appellant was permitted to interrogate him concerning conversations he had had with deceased, and instructions given him by deceased during the course of the preparation of the will. Appellant now complains of this ruling as error. It seems to be the established rule in this state that where a latent ambiguity exists in a will such evidence is admissible. (*Estate of Donnellan,* 164 Cal. 14 [127 Pac. 166] ; *Estate of Dominici,* 151 Cal. 181 [90 Pac. 448].) As was said in the last cited case:

"There is, of course, a broad difference between testimony of the casual remark of a man as to his intention to leave a portion of his estate to this person or the other, and the positive instructions which he has given to his attorney in the very performance of the testamentary act, and in any proper case such instructions may be received without doing violence to section 1340 of the Civil Code. Thus, in *Vernor* v. *Henry,* 3 Watts, (Pa.) 385, an ambiguity arose from a discrepancy between the name and the description of a devisee, as here, and it was held that the explanatory declarations made by the testator at the time of the execution of his will, indicative of his design to give his property in a particular way to a particular person, were admissible in evidence to explain the ambiguity. (See, also, *In re Gregory Settlement and Will,* 34 Beav, 600). It should, of course, be unnecessary to add, that where a will without latent ambiguity expresses a clear intent, such evidence would never be permitted in an effort to show that the intent expressed was a mistaken one. It is only where the description of the person or property by extrinsic evidence is shown to be doubtful or imperfect, that such evidence may be employed in the effort of the court to arrive at and declare the meaning and intent which the testator, by the terms of his will, attempted, however irregularly, to declare. This under the familiar rule of evidence that a doubt arising from extrinsic evidence may be removed by extrinsic evidence."

In the instant case there is no ambiguity on the face of the will. It is clear that the testator intended to and did bequeath to Preston Duncan the sum of $15,000. If the will had stopped with that bequest the extrinsic evidence would have developed no ambiguity which could be explained by

extrinsic evidence. But the will did not stop with that bequest. It went on to provide the form and manner of payment of the bequest and here uncertainty arose in the mind of the executor, and extrinsic evidence, the testimony of the attorney who prepared the will, developed grounds for such an uncertainty.

The attorney testified that the deceased first consulted him about preparing a will in October, 1930; that the consultation extended over a number of weeks; that during October deceased brought with him memoranda in his own handwriting setting forth in detail the bequests he desired to make. On this paper appeared: "Preston Duncan (10 notes) 5 cash". During the consultation the attorney wrote "uncan" above the word "Duncan", and after the word "cash", "Hollywood—wife" so that this portion of the memoranda completed
uncan
in the presence of deceased then read, 'Preston Duncan (10 notes) 5 cash Hollywood—wife". From other items of the same memoranda and from the testimony of the attorney it conclusively appears that "10 notes" was intended and understood to mean about $10,000 in promissory notes which Preston Duncan then owed deceased; that "5 cash" was intended and understood to mean $5,000 in cash which deceased desired Preston Duncan to receive in addition to the $10,000 in the form of his notes, making a total bequest to Preston Duncan of $15,000. The attorney testified that the words "Hollywood—wife" were written as his memorandum indicating the address of Preston Duncan and the expressed intention of the testator that if Preston Duncan died before the testator the bequest should not lapse but that Duncan's wife should succeed to it. This attorney further testified that in the latter part of November or in December, 1930, deceased returned to his office and informed him "that he had, among other things in regard to this Preston Duncan bequest, loaned Preston Duncan additional money and that the wording of the Will as I had it, of ten thousand dollars in notes which were cancelled and five thousand in cash wouldn't cover it, and suggested that we word it so that whatever he had given Duncan, which he then said was in the neighborhood of thirteen thousand dollars, would be a credit against the bequest. He said that Preston Duncan might pay part of it or that he might add something to it, and wanted the Will so worded

that the whole thing would not be over fifteen thousand dollars including any additional loans, by virtue of the fact that he thought fifteen thousand dollars was all that he should have, . . . ''

When we examine the notes we find that in October, 1930, deceased held one note of class 1, two notes of class 2, and one and perhaps two notes of class 3, this latter depending on the exact date in October when the conversation with the attorney took place. These notes thus totaled either $9,000 or $10,000, which corresponds closely with his written estimate that Preston Duncan owed him notes totaling $10,000. The evidence further shows that between the date of this conversation and the final conversation which resulted in giving the instructions under which the paragraph of the will in question here was drawn, deceased had received one note falling in class 1 and one or two notes falling in class 3, totaling either $2,100 or $3,100. It is clear that in his own mind he made no distinction between the different classes of notes and believed them all obligations of Preston Duncan. It is also too clear for argument that he desired and expected all of the notes, regardless of the form of the signature each bore, to be charged against the bequest to Preston Duncan.

Under this state of the record does there appear a latent defect in the will that can be explained by extrinsic evidence so that the undoubted intention of the testator may be given force and effect by the courts? We think this question must be answered in the affirmative. In reaching this conclusion we have been assisted by the following cases: *Patch* v. *White, supra; Estate of Dominici, supra; Estate of Donnellan, supra; Taylor* v. *McCowen, supra; Estate of Heins,* 132 Cal. App. 131 [22 Pac. (2d) 549]. Without analyzing these cases in detail it should be remarked that while in none of them is the precise question before us decided, by analogy they present strong arguments supporting the conclusion we have reached.

While the stipulation concerning the testimony which Preston Duncan would have given does not bring into the case the theory that the Preston Duncan Studios, Ltd., was the *alter ego* of Preston Duncan, it furnishes added reasons for the conclusion that all the notes should be charged against the bequest of $15,000. The following inferences may be drawn from it: That Preston Duncan owned the majority

of the corporate stock and "all but the qualifying shares" of the directors; that the forms of the notes, including the signatures they bore, were not discussed with the testator; that Duncan did not change the forms of the notes to defraud anyone, including deceased, which must refer to the fact that some of the notes were executed by different makers.

Actual fraud is thus defined in section 1572 of the Civil Code: "Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: . . . 5. Any other act fitted to deceive."

If giving the notes in class 3 was not done with intent to deceive deceased the inferences follow that they must have been given under the belief that they were obligations of Preston Duncan; that neither deceased nor Preston Duncan differentiated between Preston Duncan and the corporation owned by him; that deceased accepted those notes as the obligations of Preston Duncan, believing that they bound Duncan and in his will treated them as the obligations of Preston Duncan.

Under the circumstances disclosed by the record the trial judge was justified in concluding that there was a latent ambiguity in the will; that this ambiguity was cured by extrinsic evidence; that it was the intention of the testator that all the notes in classes 1, 2, and 3 be charged against the bequest to Preston Duncan. It follows that the decree cannot be reversed. As the findings on the question of the *alter ego* are not necessary to support the decree they may be disregarded.

Decree and judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 19, 1937. Thompson, J., and Edmonds, J., voted for a hearing.