25 Cal.App.3d 945 (1972)
102 Cal. Rptr. 345
Estate of MILDRED FLINT, Deceased.
SECURITY PACIFIC NATIONAL BANK, as Trustee, etc., Petitioner,
v.
BARBARA KULP, Objector and Appellant.
MARK DICKENS HARRIS, Claimant and Respondent.
Docket No. 11121.
Court of Appeals of California, Fourth District, Division One.
May 24, 1972.
*948 COUNSEL
Harris & Hollingsworth and William Hollingsworth for Objector and Appellant.
Lewis, Novak & Campbell and Carlisle C. Lewis, Jr., for Claimant and Respondent.
OPINION
WHELAN, J.
Barbara Kulp has appealed from an order of the probate court (the 1971 order) directing distribution to Mark Dickens Harris of the assets of a testamentary trust which had terminated.
Barbara and Mark are children of Mildred Flint by different fathers. The trust was created by the will of their mother, who died in 1956.
Mark was born November 19, 1944. Barbara was a child of an earlier marriage of the testatrix and was 9 years of age when her mother married the father of Mark on December 19, 1939. The elder Mark Harris adopted the then Barbara Jensen in 1949; when he died he left her $1,000. Barbara married George Kulp in June of 1950.
All of Mrs. Flint's estate came to her from the elder Mark Harris when he died.
By the will, dated December 8, 1955, Mrs. Flint stated she revoked all earlier wills, and made only one bequest to Barbara by name, the sum of one dollar; a like amount was given to each of two sisters and two brothers of the testatrix. All of Mrs. Flint's jewelry was given to Mark.
The only other disposition was of the residue, which was given in trust to Security Trust and Savings Bank of San Diego, now Security Pacific National Bank, "for the sole and exclusive benefit of my son, Mark."
All income was to be paid to Mark or his guardian; the trustee was authorized in its absolute discretion, if Mark should for any reason be in need of funds for his proper care, maintenance or education, to: "... pay to or apply for his benefit, in addition to the net income then payable to him as hereinabove provided, such amounts from the principal of the trust estate, up to the whole thereof, as the Trustee may from time to time deem necessary or advisable for his use and benefit."
*949 Termination of the trust was provided for in the following language: "This trust shall cease and terminate when Mark has died or reached the age of twenty-five, whichever event first occurs. Upon termination of said trust, the Trustee shall distribute and deliver all of the remaining trust estate to such child or children as are then living, share and share alike, and if no child be then alive, then in such event said trust estate shall vest according to the laws of intestacy of the State of California."
The will contained also the following provision: "I declare that except as otherwise provided in this Will, I have intentionally omitted to provide herein for any of my heirs living at the time of my death."
The will was admitted to probate on May 4, 1956.
The trust estate was distributed to the trustee named in Mrs. Flint's will on July 5, 1957, by a decree (the 1957 decree) which quoted the language of the will as to the terms of the trust, and repeated exactly the quoted language of the will as to termination of the trust.
The 1971 order was based upon written findings of fact and conclusions of law as follows:
"4. That at the time of the execution of the Will containing the testamentary trust, the testatrix Mildred Flint and her daughter Barbara Kulp were estranged.
"5. That testatrix intended and so instructed her attorney, in drafting her Will, to disinherit Barbara Kulp in said Will and to preclude said Barbara Kulp from taking under the Will and sharing in the distribution of the testamentary trust contained therein.
"6. That Paragraph Fourth of the Last Will of Mildred Flint, by providing for a specific bequest of One Dollar ($1.00) to Barbara Kulp, was intended to provide for the disinheritance of Barbara Kulp.
[Conclusions of Law]
"From the foregoing Findings of Fact, the Court makes the following Conclusions of Law:
"1. That Paragraph `Fourth' of the Last Will of Mildred Flint disinherits Barbara Kulp.
"2. That the disinheritance of Barbara Kulp in Paragraph `Fourth' pervades the entire Last Will and Testatment of Mildred Flint.
"3. That Barbara Kulp is excluded from the class of persons entitled to distribution of the Trust upon termination.
*950 "4. That Mark Dickens Harris is included in the class of persons entitled to distribution upon termination of said Trust.
"5. That said Trust shall be distributed to Mark Dickens Harris."
The 1971 order for distribution of the assets of the trust to Mark repeats the language of the quoted conclusions of law.
The 1971 order did not in terms state the meaning of the language of the 1957 decree and of the will incorporated in that decree, nor did it declare that the language of the decree and will was ambiguous.
The 1971 order did not define in terms the class to the members of which distribution should be made; it did not say whose child or children were to take. It merely said Mark is included in the class of persons entitled; Barbara is excluded from that class.
(1) As impliedly found by the trial court, the use of the words "such child or children as are then living" provides for a gift of the trust remainder to a class as judicially defined; i.e., "`to a body of persons uncertain in number at the time of the gift, to be ascertained at a future time, who are all to take in equal or some other definite proportions, the share of each being dependent for its amount upon the ultimate number.'" (Estate of Henderson, 161 Cal. 353, 360 [119 P. 496]; see also Estate of Clark, 64 Cal. App.2d 636, 641 [149 P.2d 465].)
Over the objection of Barbara, an attorney, who prepared the will, testified to instructions given him as follows: "She wanted to be sure that Mark was taken care of during his minority, and she pointed out in these other wills that it carried through until he was 25, these trust arrangements, and then she wanted everything, when he reached his 25th birthday, to go to Mark. We then took up the question: what would happen in the event Mark died before the trust ended? and at that time she said that she wanted, in that event, if Mark had children, she wanted it to go to his children."
He testified that after the will had been prepared it was read by the testatrix; after she had read it there was no discussion as to what was meant by the phrase "child or children"; the attorney had no recollection of any discussion of any of the terms of the will.
Also, over objection, the attorney testified Mrs. Flint had stated to him she wanted to disinherit her daughter and only give her a dollar.
Over objection by Barbara, Teresa Barnes testified to a conversation with the then Mildred Harris in 1952 or 1953, when Mrs. Harris expressed animosity toward Barbara, expressed dislike toward Barbara's husband, and said Barbara had no interest in her.
*951 A will executed by Mildred Harris in 1951 and an unexecuted draft of a will dated November 5, 1954, were received in evidence over Barbara's objection.

WHETHER THE 1957 DECREE WAS AMBIGUOUS, IN RESPECT OF WHAT IT WAS AMBIGUOUS, AND HOW SUCH AMBIGUITY MAY BE RESOLVED.
Barbara argues such evidence was inadmissible and the language of the decree is unambiguous.
Whether it is ambiguous must be a preliminary question. For reasons we discuss hereafter, we see the decree as being ambiguous on its face, as was the will whose language the decree incorporates.
The ultimate question is as to the meaning of the language of the 1957 decree with regard to the person or persons to take the trust assets upon termination of the trust. (Estate of Callnon, 70 Cal.2d 150 [74 Cal. Rptr. 250, 449 P.2d 186].)
The class of persons entitled to distribution could only be "such child or children" as were living at the time of termination of the trust either by reason of Mark's completing his 25th year or his earlier death.
Although the 1971 order did not declare the 1957 decree or the will to be ambiguous, they are, of course, ambiguous on their face, and open to interpretation as to whose child or children was intended. If the 1971 order itself be interpreted for the purpose of determining the class of takers that it mentions but does not define, it should be done with reference to the document it was seeking to effectuate  the decree of July 5, 1957.
(2) We are dealing with the meaning of the 1957 decree. In that situation, "[t]he understanding of the court, not that of the parties, is the determinative factor." (Russell v. Superior Court, 252 Cal. App.2d 1, 8 [59 Cal. Rptr. 891].)
Probate Code section 1021 provides in part as follows:
"Such order or decree [of distribution], when it becomes final, is conclusive as to the rights of heirs, devisees and legatees."
"A decree of distribution is a judicial construction of the will arrived at by the court ascertaining the intent of the testator. [Citations.] Once final, the decree supersedes the will [citations] and becomes the conclusive determination of the validity, meaning and effect of the will, the trusts created therein and the rights of all parties thereunder." (Estate of Callnon, 70 Cal.2d 150, 156 [74 Cal. Rptr. 250, 449 P.2d 186].)
*952 (3) Only if the 1957 decree is ambiguous on its face may resort be had to the will to aid in the interpretation of the decree, but not to contradict it. (Estate of Callnon, supra, 70 Cal.2d 150, 156-157.) "[W]here the decree is ambiguous, the will may be used to resolve the ambiguity [citations]; where the decree, by its own terms, incorporates it the will may be looked to for varying purposes, such as: to supply matter omitted from the decree as well as also to clarify the decree's ambiguities [citations]." (Estate of Cooper, 274 Cal. App.2d 70, 75 [78 Cal. Rptr. 740].) (See also Estate of Page, 254 Cal. App.2d 702, 709 [62 Cal. Rptr. 740]; Estate of Colyear, 10 Cal. App.3d 670, 676 [89 Cal. Rptr. 147].)
Clearly, the words "child or children" are not used as classifying according to age, but according to a child-parent relationship.
Since the children mentioned are not classified according to an age description but according to a child-parent relationship, whose child or children are referred to?
From the 1957 decree itself, it appears there were two children of the testatrix named therein.
Nowhere, except in the paragraph dealing with the disposition of the remaining corpus of the trust upon termination, does the decree use the words "child" or "children." Barbara is mentioned by name as a daughter, Mark as a son.
Although the question of whose children are meant might be answered from the decree itself, the decree does not purport to say whether the testatrix had other children or how many children she had.
(4) One of the governing rules with respect to the construction of a will is that the words are not to be construed by any one section or paragraph but that the instrument must be read as a whole (Estate of Vizelich, 129 Cal. App. 347 [18 P.2d 773]; Estate of Somerville, 12 Cal. App.2d 430 [55 P.2d 597]), and that all parts of a will are to be construed together and in relation to each other so as to form, if possible, a consistent whole (Estate of Mayne, 28 Cal. App.2d 340 [82 P.2d 504]). (Estate of Northcutt, 16 Cal.2d 683, 689 [107 P.2d 607]; see also Estate of Hampton, 262 Cal. App.2d 532, 536 [68 Cal. Rptr. 828, 30 A.L.R.3d 790].)
We may, therefore, look to other parts of the will than those incorporated in the decree for any light they may give in resolving the patent ambiguity of the decree as to whose children were intended and as to their names.
In her will the testatrix declared she had two children, Barbara and *953 Mark. There is no mention of child or children classified as standing in a filial relationship to any other person.
If we look only to the 1957 decree itself and to the will whose language is incorporated in the decree, the class referred to in the order appealed from could mean only the children of Mildred Flint, of which class Mark was found to be one, but of which class Barbara was found not to be one, because disinherited.

ADMISSIBILITY OF THE SCRIVENER'S TESTIMONY.
May we also examine the will for the purpose of creating possible latent ambiguities in the will and decree by traveling outside the boundaries of the will to create such latent ambiguities in the will, then to transfer them to the language of the decree borrowed from the will, and resolve them by oral testimony as to conversations that took place when the will was drawn?
Probate Code section 105 provides: "When there is an imperfect description, or no person or property exactly answers the description, mistakes and omissions must be corrected, if the error appears from the context of the will or from extrinsic evidence, excluding the oral declarations of the testator as to his intentions; and when an uncertainty arises upon the face of a will, as to the application of any of its provisions, the testator's intention is to be ascertained from the words of the will, taking into view the circumstances under which it was made, excluding such oral declarations."
(5) Oral declarations of a testator to the attorney who drew his will are admissible in two types of cases: where there is a latent ambiguity in identification of the intended beneficiaries, that is, which of several persons fitting the description of the beneficiary in the will was intended by the testator to be the recipient (Estate of Carter, 47 Cal.2d 200, 207-208 [302 P.2d 301]; see also Estate of Little, 170 Cal. 52, 54 [148 P. 194]; Estate of Dominici, 151 Cal. 181, 186 [90 P. 448]; Estate of Donnellan, 164 Cal. 14, 17, 20 [127 P. 166]); where there is a latent ambiguity in the description of property in a will (Estate of Resler, 43 Cal.2d 726, 735 [278 P.2d 1]; Estate of Halsell, 133 Cal. App.2d 665, 669-670 [284 P.2d 821]; Estate of Hotaling, 72 Cal. App.2d 848, 857 [165 P.2d 681]; Estate of Greenwald, 19 Cal. App.2d 291, 298 [65 P.2d 70]); for the purpose of showing the understanding of the testator as to the meaning of certain words reasonably susceptible of more than one meaning (Estate of Russell, 69 Cal.2d 200 [70 Cal. Rptr. 561, 444 P.2d 353]; Estate of Mohr, 7 Cal. *954 App.3d 641, 647 [86 Cal. Rptr. 731]); or to show whether a certain instrument was executed with testamentary intent (Estate of Sargavak, 41 Cal.2d 314, 319 [259 P.2d 897]).
(6) Such evidence is not admissible for the purpose of showing what the testamentary intentions of the testatrix were (Estate of Jones, 55 Cal.2d 531 [11 Cal. Rptr. 574, 360 P.2d 70]; Estate of Resler, supra, 43 Cal.2d 726, 734; Estate of Johnson, 107 Cal. App. 236, 240 [290 P. 314]; Estate of Mohr, supra, 7 Cal. App.3d 641, 647; Estate of White, 9 Cal. App.3d 194, 201 [87 Cal. Rptr. 881]; O'Farrell v. American Trust Co., 149 Cal. App.2d 691, 697 [309 P.2d 60]).
(7) Extrinsic evidence is admissible not only to resolve a latent ambiguity in a will, but also to show that a latent ambiguity exists, as by showing that more than one person met the description of a beneficiary in the will, that more than one thing met the description of what appeared as a specific devise or bequest, or that certain language of the will was understood and intended by the testator to have a meaning different from what on its face it appeared to have.
(8) The purpose of such evidence is and must be only to determine the intention of the testator as expressed in the language of the will. It may not be used to discover an intention of the testator dehors the will, although it may show the sense in which the actual language of the will was understood by the testator, if the language used had for her a meaning it might not have to the judicial interpreter and if such meaning is reasonable in the light of all the language of the will.
The court in Estate of Russell, supra, 69 Cal.2d 200, 212, states: "If in the light of such extrinsic evidence, the provisions of the will are reasonably susceptible of two or more meanings claimed to have been intended by the testator, `an uncertainty arises upon the face of a will' (§ 105) and extrinsic evidence relevant to prove any of such meanings is admissible (see § 106), subject to the restrictions imposed by statute (§ 105)."
(9) The extent to which resort may be had to extrinsic evidence to interpret the decree is measured by the extent to which the ambiguity is apparent in the will itself and for the resolution of which such evidence might be introduced according to the usual rules for the interpretation of wills, unless the rule applies here by which an ambiguity might be shown in the will by extrinsic evidence as to the existence of two or more persons meeting a description, or of two reasonably possible meanings of words used therein of which one expressed the understanding of the testator.
If the rule might apply, such evidence could be only as to whether *955 there were children of a person other than the testatrix who met the description of the will; and, if not, whether there were other children of the testatrix than Mark and Barbara.
There was no evidence on either score, except the mention of possible children of Mark in the testimony of the scrivener, which we discuss hereafter.
We think, moreover, that the resolution of a latent ambiguity by evidence of the oral declarations of a testator to differentiate between two or more persons answering to the same name or description in a will has to do with persons in existence at the time the will was drawn. That, of course, allows for the future issue of such persons to be identified; but it is the persons in being who are identified, not their possible future issue.[1]
No testimony was given that there was in existence any person whose children might have been intended other than those of the testatrix.
There was, however, the testimony of the scrivener as to the instructions given him.
That testimony may not be considered for the purpose of showing the testamentary intentions of the testatrix.
As testified to by the attorney, the testatrix desired a disposition that would have been expressed in the following language: "In the event the trust shall be terminated by the completion of his 25th year by my son, Mark, all of the trust assets shall be distributed to him; in the event the trust shall be terminated by the earlier death of Mark, and he should have a child or children, the trust assets shall be distributed to such child or children as may be living at his death; and if there be no such child or children, then such assets shall pass according to the laws of intestacy."
The order appealed from does not interpret the will as having such meaning, and the language of the will is not fairly susceptible of such meaning.
To interpret the language in that manner would be, indeed, to rewrite the will.
The earlier language of the will stating the trust was for the benefit of Mark does not supply the missing proposition.
*956 The language actually used in the will cannot be stretched or expanded to mean that upon termination of the trust the assets were to be distributed to Mark, except as he falls within the definition of "child or children" as used therein.
The questioned language of the will and 1957 decree is reasonably susceptible of only one conclusion: the same class was to take upon termination of the trust on either contingency.
That class could only be the child or children of the testatrix.
If the testimony of the scrivener were to serve to identify a class other than that of the children of the testatrix, it would require that the following interpretation be placed upon the language used: "child or children" includes both the children of the deceased and children of her son; the children of the deceased, excluding Barbara as having been disinherited, are intended to take should Mark complete his 25th year; his children are to take if he dies earlier.
The provision for distribution of the assets covers a termination of the trust under either of the two contingencies. To fit together the language actually found with other language to be supplied in order to give effect to Mark's contentions would require the introduction of language which differentiates between the contingencies as to their respective effects upon the disposition of the trust remainder in a way that the language actually used does not.
The fact Mark reached his 25th birthday is irrelevant in determining the meaning of the language of the 1957 decree and the will which it quotes. The language of that decree had the same meaning on the 25th anniversary of Mark's birth as when it was made. When it was made it contemplated a possible termination of the trust by either of two non-compatible contingencies. It did not provide for one disposition in the one contingency and a different disposition in the other.
The language of the decree provides for a disposition to a class. The provision that if Mark reached age 25 the trust remainder should go to him would not be a gift to a class, even though a class gift were provided for if he should not survive.
Under no reasonable construction of the language of the will can such an intention be discovered, since the gift was to a class in either event, and the same class is by that language to take upon termination of the trust by either contingency.
If Mark's child or children were the class intended by the language used, then there was no one of that class and the gift under the will was *957 to "vest according to the laws of intestacy," that is, in Mark and Barbara equally.
The language is not reasonably susceptible of the meaning it was a class consisting of Mark and his children, nor does evidence of the circumstances of the making of the will, including the declarations of the testatrix, suggest that as a possible meaning, since the only meaning of which the language is susceptible is that the same class should take in either event.
(10) While the use of the word "children" in a will has sometimes been interpreted to mean grandchildren (Estate of Craig, 64 Cal. App.2d 132 [148 P.2d 100]; In re Schedel, 73 Cal. 594 [15 P. 297]), we know of no authority for the proposition that a class designated as "child or children" may include at the same time a child of the testatrix and the child or children of that child, while excluding another child of the testatrix.
There is no evidence from which it could be found the language used was reasonably susceptible of more than one meaning, in one of which it was understood by the testatrix in a different sense than might be apparent to the judicial interpreter.
There was therefore no extrinsic evidence as to the sense in which the testatrix understood and used the language that describes the class of persons to take the trust remainder upon termination of the trust.
If the class to be benefited is not identifiable from the language of the will as a result not of there being more than one group of children to whom the description applied, but from the inadequacy of the language of the will considered with reference to all relevant circumstances, then the gift fails and the remainder passes under the laws of intestacy.[2]

THE OTHER EXTRINSIC EVIDENCE.
The revoked will dated October 11, 1951 showed a testamentary plan which was not the same as in the last will, although Mark was the chief beneficiary.
*958 The draft of a will dated November 5, 1954, was not signed by the testatrix, although three signatures appear as witnesses. The circumstances under which it was prepared were not shown.
Both documents were given by the testatrix to the scrivener of her last will. In that respect they might be considered as circumstances under which the will was made. The testatrix had remarried after 1954, so it was necessary for her to execute a new will. The last will could not under any reasonable construction be said to have carried out the intentions clearly expressed in the revoked will of 1951 or the unexecuted writing of 1954. Their language may not be substituted for that of the last will.
(11) It is generally true that a revoked will several years earlier in date should not be received in evidence as a circumstance surrounding the execution of the last will considered to be ambiguous. (Estate of Vanderhurst, 171 Cal. 553 [154 P. 5]; Estate of Lewis, 91 Cal. App.2d 322 [204 P.2d 898]; cf. Estate of Whitney, 162 Cal. App.2d 860 [329 P.2d 104].)

WHETHER THE DAUGHTER WAS EXCLUDED FROM THE CLASS OF BENEFICIARIES BY DISINHERITANCE.
Since we have reached the conclusion the class gift of the trust remainder was to the child or children of the testatrix, how is that disposition affected by the gift in the will of one dollar to Barbara and the testimony of the scrivener the decedent had said she wished to disinherit Barbara?
First, we see no irreconcilable inconsistency between the gift of one dollar and the gift of a share in the trust remainder.
The intention of the testatrix was clear that almost all of her estate should be held in trust for the sole benefit of her son until he should reach age 25. To further that end there were in favor of others only nominal bequests. When it is considered that the value of the trust estate distributed by the 1957 decree was less than $40,000 at the time of the death of the testatrix, and that Mark, when the will was made, was 11 years old, it would not be inconsistent with an intention to secure the maintenance of Mark until his 25th birthday that when that end should have been served Barbara might share in the remainder if any. She would certainly do so even under Mark's theory had he died before age 25 without surviving issue. To have prevented that result, the testatrix must have made some different contingent provision than that the property pass according to the laws of intestacy.
In Estate of Goetz, 13 Cal. App. 266, 267-268 [109 P. 105], the court said the testator made these provisions:
*959 "By the fifth clause he devised to the appellants, three nephews and a niece, all his real estate.
"In the sixth clause among other gifts he bequeathed to the appellants certain pictures, some jewelry and his household furniture, all of substantial value.
"The seventh clause reads as follows: `I make no money bequests to my nephews and niece which are mentioned in paragraph Fifth of my will as the real estate owned by me at the time of my death so bequeathed to them in equal shares is ample and sufficient.'
"The only other clause in the will that need be quoted is clause 13, which reads as follows: `If there should be some surplus of money from the sales of my personal properties consisting of mortgages [sic] notes; and shares of stocks and banks account so mentioned shall be divided equally among the legatees herein mentioned in this will share and share alike.'"
The nephews and niece named in the fifth clause and mentioned in the seventh clause were held entitled to share under clause No. 13.
(12) As a general proposition the bequest of one dollar to an heir at law shows an intention that the heir receive no other benefit under the will. (Estate of Carroll, 138 Cal. App.2d 363, 366-367 [291 P.2d 976].)
In Estate of Moore, 219 Cal. App.2d 737, 739 [33 Cal. Rptr. 427], the will provided: "`"I hereby give unto my brother Alfred Finley Moore the sum of One Dollar and unto his wife Chella D. Moore the sum of One Dollar. They are my only heirs."'" Of that clause this court wrote, at page 741: "`Looking at the will above quoted, it seems apparent at once that the intentions of the testator were: First, practically to disinherit his only heir at law, Alfred Finley Moore, by giving him the sum of one dollar, and throwing in by way of largess the further sum of one dollar to his brother's wife. Such a provision in a will is intended by well-known custom and connotation to mean that the testator has in mind his mentioned heir and intends to leave him a nominal sum only and in fact to disinherit him. (Estate of Frinchaboy, 108 Cal. App.2d 235, 238....)'"
Many of the California cases holding an heir had been disinherited contain much more explicit language than the provision for a nominal gift. (See Estate of Hayne, 165 Cal. 568, 571 [133 P. 277]; Estate of Winbigler, 166 Cal. 434, 436 [137 P. 1]; Estate of Trickett, 197 Cal. 20, 22 [239 P. 406]; Estate of Munson, 164 Cal. App.2d 146, 147-148 [330 P.2d 302]; Estate of Kurtz, 190 Cal. 146, 147-148, 149 [210 P. 959].)
That fact was noted by the court in Estate of Carroll, supra, 138 Cal. *960 App.2d 363, 367, where the court said: "[I]n the California cases on disinheritance the language of disinheritance was more than the mere bequest of a nominal sum."
In Estate of Torregano, 54 Cal.2d 234, 252-253 [5 Cal. Rptr. 137, 352 P.2d 505, 88 A.L.R.2d 597], the court said: "Clause Thirteenth is a typical clause intended to prevent contest. Under the construction of the will in this opinion the clause is given full effect as a no contest clause. Such a clause differs radically from a clause of disinheritance. The true disinheritance clause often fails to name a specific presumptive heir, and yet may be interpreted to exclude the same because of the use of words expressly indicating an intent to disinherit. Typical examples of general disinheritance clauses are: `I purposely leave nothing to anyone not mentioned in this will....'; `I intentionally leave nothing to any other person, with full knowledge ...' Perhaps that most widely used (and most often interpreted to exclude presumptive heirs, even though unnamed) is some form of the clause found in Van Strien v. Jones, 46 Cal.2d 705 ..., wherein the testator expresses his intent to exclude or leave a nominal sum to any person, not named in the will, `who if I died intestate would be entitled to share in my estate.' Such language was also in the will under scrutiny in Estate of Fernstrom, 157 Cal. App.2d 380 ..., relied upon by respondent. Often a testator combines in one clause provisions intended to bar contest with general language of disinheritance."
In the will of Mildred Flint, she used this explicit language with regard to her third husband, Robert Flint: "[I]t is my express desire in executing this Will to disinherit the said ROBERT FLINT and to further deny him any rights which he might otherwise have in any of my property under the laws of succession."
The cases we have cited do not hold that an heir to whom a bequest of one dollar has been made is excluded from inheritance of property otherwise undisposed of; nor do they hold that such a bequest, of its own force, excludes the heir from membership in a class to which he otherwise belongs.
The gift of one dollar to Barbara, taken together with the language of paragraph eighth of the will: "except as otherwise provided in this will, I have intentionally omitted to provide herein for any of my heirs living at the time of my death," does not answer the question whether Barbara was a member of the class mentioned in the trust provisions.
If ambiguity exists whether the testatrix intended a complete disinheritance of her daughter, it is an ambiguity that is patent upon the face of the will arising from the bequest of one dollar in contrast to the provision *961 for giving the trust corpus to "such child or children as are then living."
The state of the feelings of the testatrix toward her daughter would be a relevant fact or circumstance attending the execution of the will which might be shown by extrinsic evidence, including oral declarations of the testatrix, not for the purpose of showing her testamentary intentions but to show the state of her feelings.
If it be said the testimony of the scrivener as to the testamentary intentions of the testatrix were admissible to show more than the state of feeling of the testatrix toward her daughter, and explicitly to show the sense in which she understood the language of the one dollar bequest, that language must still be considered with all other language of the will, including the language creating a class gift of the trust remainder.
Nothing in the language creating a class gift of the remainder suggests an intention to exclude the daughter from that class. The word "children" in the plural is meaningless were the daughter excluded; and if the trust were to terminate by reason of Mark's death the only possible child to be living at the time would have been the daughter.
We do not believe those oral declarations in any way define or distinguish the class of persons: i.e., "child or children as are then living"; for that reason they may not be considered as excluding from the only class of persons to whom the language of the decree could be reasonably held to apply, the child or children of the testatrix, one of those children.
(13) The cardinal rule of construction and interpretation of wills is to ascertain the testator's intent. (Prob. Code, § 101; Estate of Salmonski, 38 Cal.2d 199 [238 P.2d 966].) "[I]t is likewise fundamental that the intent covering the construction of a will is not that which existed in the testator's mind, but that which existed in the language of the will itself." (Estate of Thomason, 245 Cal. App.2d 793, 799 [54 Cal. Rptr. 229].)
To say Barbara was excluded from taking under the provision for distribution of the trust remainder because she had been disinherited is to argue in a circle. She had not been disinherited if she was one of those to whom distribution of the trust remainder was directed; in that case the question of disherison could not arise.
In Estate of Frinchaboy, 108 Cal. App.2d 235, 237 [238 P.2d 592], the court stated "[P]arol evidence may not be resorted to for the purpose of showing the intention of the testator to omit an heir from his will. The evidence which is admissible serves merely to point out the person the testatrix intended to include, not omit."
*962 We do not determine whether the rule as stated applies except where the question is whether the name of a child or grandchild had been omitted from a will intentionally. (See Estate of Trickett, supra, 197 Cal. 20; Rhoton v. Blevin, 99 Cal. 645 [34 P. 513].)
In Estate of Garraud, 35 Cal. 336, it was held error to admit evidence of the decedent's declarations; in other cases the refusal to admit such evidence was sustained. (In re Salmon, 107 Cal. 614 [40 P. 1030]; In re Stevens, 83 Cal. 322, 328 [23 P. 379].)
(14) An implied intent to exclude Barbara from every benefit except for the sum of one dollar left to her without further comment, and evidence of the statements of the testatrix, are not sufficient to exclude her from the class of which she was a member, which could be the only class to take the trust remainder.
The only classes to which Mark belonged that Barbara did not were those based on age or sex. Nothing in the language of the will would permit the narrowing of "child or children" by the addition of such qualifications.
If Mark was a member of the class entitled to distribution because he was a child of the testatrix, so, too, was Barbara.
The order appealed from is reversed with directions to the trial court to make its order distributing the trust assets to the children of the testatrix living at the time Mark Dickens Harris completed his 25th year.
Brown (Gerald), P.J., and Coughlin, J.,[*] concurred.
Respondent's petition for a hearing by the Supreme Court was denied July 19, 1972.
NOTES
[1] It would, of course, be possible for a gift to be made to all of a testator's redheaded grandchildren, in which case the extrinsic evidence would not be for the purpose of showing the existence of several parents who met the same description, but of several children who met the description; since they might not have been born when the will was made, the extrinsic evidence would probably not consist of oral declarations of the testator.
[2] If there is an arguable possible further patent ambiguity as to whose heirs should take in the event there was no child alive at the termination of the trust, that question is answered by a determination as to when the trust remainder was intended to vest. There would be no question if the testatrix had directed the remainder should go to her heirs at law if no child were living at the termination of the trust.

The interests of the remaindermen came into existence upon the death of the testatrix. (Estate of Baird, 135 Cal. App.2d 333, 341 [287 P.2d 365].)
Since they were the children of the testatrix, as we hold, and were living at her death, it is possible to argue that if neither had been alive at the termination of the trust it would be their respective heirs, rather than the heirs of the testatrix, in whom the remainder should vest. Since both children were alive, the possible ambiguity need not be resolved.
[*] Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.