[Civ. No. 61707. Second Dist., Div. Two. Dec. 2, 1981.]

Estate of NINA CLEAVER, Deceased.
SECURITY PACIFIC NATIONAL BANK, as Executor, etc.,
Petitioner and Respondent, v.
ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES,
Objector and Appellant;
BISHOP OF THE PROTESTANT EPISCOPAL CHURCH IN
LOS ANGELES, Claimant and Respondent.

COUNSEL

Brandlin & McAllister and Ray E. McAllister for Objector and Appellant.

No appearance for Petitioner and Respondent.

O'Melveny & Myers, Solomon M. Kamm and Barton H. Thompson, Jr., for Claimant and Respondent.

OPINION

**COMPTON, J.**—Nina Cleaver executed a holographic will in 1954. She was 66 at the time. She died in 1978, at the age of 90 and the will was admitted to probate.

The will purported to divide her estate among four beneficiaries in equal amounts. We are here concerned with that provision of the will which left one-quarter of the estate to *"The Archbishop of Los Angeles and San Diego,* a corporation sole, to be used for charitable purposes giving particular attention to deserving elderly persons." (Italics added.)

The executor of the estate petitioned the superior court for assistance in determining the identity of the beneficiary under the above referenced provision. The official titles of the contending entities are "The Roman Catholic Archbishop of Los Angeles" on the one hand and on the other "The Bishop of the Protestant Episcopal Church in Los Angeles," both of whom are corporations sole and neither of which are legally or officially known by the designation employed by the testator.

After hearing extrinsic evidence presented by both sides, the trial court granted the claim of the Episcopal Bishop. The Roman Catholic Archbishop has appealed. We affirm.

Both parties essentially agree on the fundamental legal principles involved. They further agree that there was no substantial conflict in the extrinsic evidence. The dispute centers around the application of these legal principles and the effect and weight to be accorded to the extrinsic evidence.

The extrinsic evidence covered essentially three areas. (1) the evolution of the official titles and jurisdictions of the two competing entities, (2) the religious orientation of the decedent, and (3) certain statements and conduct of the decedent at a time prior to the execution of the will.

The trial court initially permitted introduction of extrinsic evidence to establish that there was in fact an ambiguity in the language of the will. Appellant does not quarrel with that ruling and acknowledges that neither entity exactly answers the description used by the testator. Appellant, however, contends that the extrinsic evidence disclosed that its title is the only one sufficiently similar to that used by the testator to permit a reasonable interpretation that it was the intended beneficiary.

From this appellant postulates that the extrinsic evidence could serve no further purpose and that the trial court erred in relying on extrinsic evidence to reach a conclusion that the testator intended by the language used to designate the Episcopal Bishop as the beneficiary. Appel-

lant's approach relies too heavily on the technical meaning of the words and unduly restricts the function of extrinsic evidence.

■ We approach our analysis of this dispute in accordance with the usual rule governing the review of interpretation of writings which requires us to make an independent interpretation where, as here, the trial court's interpretation does not rest on factual findings drawn from conflicting evidence. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861 [44 Cal.Rptr. 767, 402 P.2d 839]; 6 Witkin Cal. Procedure (2d ed. 1971) Appeal, § 260, p. 4250.)

In 1954, when the will was executed, the Roman Catholic Bishop of Los Angeles was in fact an "archbishop," but the archdiocese did not embrace San Diego. On the other hand, the Episcopal diocese did embrace San Diego but the bishop was not an "archbishop."

The Protestant Episcopal Church in the United States does not use the title of archbishop in its organizational scheme. It is, however, a part of the Anglican Church of England, whose head is the Archbishop of Canterbury, generally considered to be the primate of all Anglican churches. The dictionary definition of archbishop, however, is "A bishop at the head of an ecclesiastical province," (Webster's New Collegiate Dict. (7th ed. 1970) p. 46), without any reference to a particular denomination.

The single most complicating feature of this matter is that the decedent was not affiliated with any church and although she apparently considered herself a Protestant, she was quite ecumenical in her gifts to charity.

This latter fact is demonstrated by the will itself. The other three beneficiaries were Father Flanagan's Boys Town, the Midnight Mission and the University of California. During her lifetime she made small donations to several religious organizations, Catholic and Protestant alike.

■ The basic obligation of the trial court here was, insofar as possible under the circumstances, to ascertain the intent of the decedent at the time she executed the will. (*Estate of Mohr* (1970) 7 Cal.App.3d 641 [86 Cal.Rptr. 731].) In so doing, however, the trial court was confined to discerning that intent in terms of the words actually used by the decedent. (*Estate of Flint* (1972) 25 Cal.App.3d 945 [102 Cal.

Rptr. 345); *Estate of Brunet* (1949) 34 Cal.2d 105 [207 P.2d 567, 11 A.L.R.2d 1382].)

Even though it may appear that a testator meant to accomplish a certain objective with his or her gift, unless he or she used words from which that intent can reasonably be inferred, the court is powerless, in effect, to write a new will, posthumously, in order to achieve that objective. (*Estate of Flint, supra; Estate of Brunet, supra; Estate of Herreshoff* (1956) 144 Cal.App.2d 597 [301 P.2d 457].)

On the other hand, a will should be interpreted in accordance with the clear intent of the testator even though that interpretation differs from the technical meaning of the words used. (*Estate of Akeley* (1950) 35 Cal.2d 26 [215 P.2d 921, 17 A.L.R.2d 647].)

In the case at bench, since the words used by the decedent did not precisely or correctly describe any existing entity, there was an ambiguity which required resolution, if possible, in order to save the devise from intestacy. (Prob. Code, § 102.)

"Broadly speaking, there are two classes of wills presenting latent ambiguities, for the removal of which ambiguities resort to extrinsic evidence is permissible. The one class is where there are two or more persons or things exactly measuring up to the description and conditions of the will, . . . The other class is where no person or thing exactly answers the declarations and descriptions of the will, but where two or more persons or things in part though imperfectly do so answer." (*Estate of Donnellan* (1912) 164 Cal. 14, 20 [127 P. 166]; see also *Estate of Russell* (1968) 69 Cal.2d 200, at p. 207 [70 Cal.Rptr. 561, 444 P.2d 353].) The matter before us is of the latter class.

Appellant contends that the key word is "Archbishop" and that the testator's descriptive phrase cannot be reasonably interpreted to mean simply "Bishop." It argues that the inclusion of "San Diego" in the testator's description is of no significance.

Appellant suggests that we should, as a matter of law, declare that the testator's phrase is susceptible of only one interpretation and thus terminate any further inquiry into the testator's intent. We disagree.

We reiterate the proposition that our role is to determine, if possible, what the *testator intended* by the words she used regardless of

the technical meaning which knowledgeable persons might give to them. (*Estate of Regnier* (1932) 123 Cal.App. 514 [11 P.2d 639].)

It is never possible to discern absolutely the intent of a testator who fails to express that intent in perfect and unambiguous language. ■ Nevertheless we must try and in so trying draw on our knowledge of the testator as portrayed by the extrinsic evidence in light of the totality of the circumstances surrounding the execution of the will.

Inasmuch as the extrinsic evidence offered to explain a testator's intent is always indirect or "circumstantial" any attempt to ascertain that intent necessarily involves the concept of probabilities.

Appellant's position and in fact the principal issue in this case is succinctly delineated in the following passages from appellant's opening brief.

"Appellant acknowledges that the trial court, upon considering the extrinsic evidence, while limited, could *reasonably have reached the conclusion* that a lady in the circumstances of decedent, as a general premise, would be more likely to make a bequest to the Episcopal rather than the Catholic Church. This was, in fact, the basic contention of Respondent throughout the hearing and rather clearly the basis upon which the Trial Court reached its judgment. . . . The issue to be determined is not what decedent might normally have been expected to do, but rather a reasonable interpretation of her intention as to what in fact she did do, as indicated by the language she chose to express that intention. . . . If the extrinsic evidence fails either to show the *possibility of a latent ambiguity, based upon the actual language of the will*, or fails to establish the intent of the testator to employ the actual language used *to mean something other than apparent on its face*, the extrinsic evidence can serve no further purpose." (Italics added.)

In short, appellant, erroneously in our opinion, sees the language rather than intent as the dominant factor, a position which stems from appellant's basic assumption that the meaning of the language used is "apparent on its face."

This is circular reasoning. If the meaning of the language was apparent on its face there would be no need to resort to extrinsic evidence to interpret it. As we have earlier observed the meaning of the language is

not apparent on its face and is susceptible of at least two reasonable interpretations.

We now turn to the extrinsic evidence on which the trial court relied in concluding that the testator intended her beneficiary to be the Episcopal entity. That evidence is summarized in the written findings of fact signed by the trial court as follows:

"4. No person or entity was at the time of the execution of this holographic Will or at any other time, commonly known as or officially named 'the Archbishop of Los Angeles and San Diego,' a corporation sole.

"5. The diocese of The Bishop of The Episcopal Church in Los Angeles at the time of the execution of the Will included Los Angeles and San Diego cities and counties.

"6. The testatrix was never a member of any religious organization. Furthermore, the testatrix was never schooled or knowledgeable in matters involving religious ideology or ecclesiastical terminology.

"7. The testatrix' closest family ties were up to and at the time of the execution of the testatrix' holographic Will, members of and active in the Episcopal Church in Los Angeles. The testatrix was aware of and often discussed her relatives' affiliation with the Episcopal Church. These relatives were delighted when the testatrix became involved in fund raising events for the Episcopal Church.

"8. At the time of her death, the testatrix owned several King James Bibles, one of which had her handwritten signature, an inscription, and a date which preceded execution of her will. The King James version of the Bible is the officially sanctioned version for use in the Episcopal Church. The King James version is not sanctioned for use in the Roman Catholic Church.

"9. The testatrix' own dictionary defines 'archbishop' non-denominationally as 'the chief bishop of an ecclesiastical province.'

"10. Bishop Stevens was, prior to the execution of the Will, the 'chief' Bishop of The Protestant Episcopal Church in Los Angeles, a corporation sole.

"11.   The testatrix, prior to the time she executed her holographic Will was personally acquainted with Bishop Stevens. During this period of time prior, testatrix knew Bishop Stevens was the chief Bishop for the diocese covering both Los Angeles and San Diego.

"12.   The testatrix, prior to the execution of her holographic Will, participated in a fund-raising event for the Episcopal Church. Bishop Stevens was present at that event.

"13.   Prior to and up to the execution of the Will, the testatrix knew of and repeatedly praised the work performed by the Episcopal Home for the Aged. The Episcopal Home for the Aged was at the time the Will was executed, geographically close to the testatrix' home in South Pasadena. Up through the time the execution of the Will, the testatrix indicated The Episcopal Home was one of the few organizations which was rendering this desperately needed service for the elderly.

"15.   The testatrix has never had any family, friends or relatives which were members of or affiliated with the Roman Catholic Church. The testatrix never owned a Roman Catholic Bible, attended Roman Catholic Church services or had any connection with the Roman Catholic Church."

■   The prior statements or conduct of a decedent which evidences an intent to do a particular thing in the future is circumstantial evidence that the intent was carried out. (Witkin, Cal. Evidence (2d ed. 1966.) The Hearsay Rule, § 566, pp. 540-541; *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627].) Hence if the testator here had previously declared an intent to provide for the Episcopal Home for the Aged in her will, there would be little doubt that the description she used would be so interpreted as carrying out her expressed intent.

True, the testator here did not make an express declaration of intent to provide for the Episcopal Home for the Aged in her will. The fact remains, however, that in making a provision in her will for care of the aged, the probability is, as appellant admits, that she would select the charity which was near her home, one with which she was familiar and one for which she had clearly expressed an admiration, rather than one which she apparently had no knowledge of or contact with in the past.

■   Stating that probability is simply to say that the circumstantial evidence supports the conclusion that the testator intended by her de-

scription of the beneficiary to identify the Episcopal entity. Except for the use of the term "archbishop," a term which we have concluded could apply to either entity, there is simply no evidence to suggest a contrary interpretation.

We conclude, as did the trial court, the ambiguous bequest when illuminated by the undisputed extrinsic evidence outlined above lucidly demonstrates the intention of the testatrix to make the Bishop of the Protestant Episcopal Church in Los Angeles her beneficiary.

The judgment is affirmed.

Roth, P. J., and Beach, J., concurred.